WELCH, Judge.
James Scott Largin was convicted of two counts of capital murder in connection with the deaths of his parents, Jimmy Largin and Peggy Largin, because they were killed pursuant to one scheme or course of conduct, § 13Á-5-40(a)(10), Ala.Code 1975, and during the course of a robbery, § 13A-5-40(a)(2), Ala.Code' 1975. By a vote of 11 to 1, the jury recommended that Largin be sentenced to death. The trial court followed the jury’s recommendation and sentenced Largin to death. The trial court found two . aggravating circumstances: that the murders occurred while Largin was engaged in, a robbery, § 13A-5-49(4), Ala.Code 1975, and that the murders were committed pursuant to one act or pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala.Code,. 1976. The trial court found one statutory mitigating circumstance: that Largin did not have a significant criminal history, § 13A-5-49(1), Ala.Code 1975. The trial court found several nonstatutory mitigating circumstances: that. Largin suffered from a narcissistic personality disorder; that Lar-gin’s upbringing was affected by his turbulent family history; that Largin .suffered from alcoholr and substance-abuse problems; that Largin’s education, military service,.and work history were evidence of Largin’s good character; and that Largin exhibited good behavior while he had been incarcerated. The trial court found that *388 the aggravating circumstances outweighed the mitigating circumstances and sentenced Largin to death. This appeal follows. We affirm.
Facts
The evidence presented at trial tended to show the following. Peggy and Jimmy Largin were at home on the night of March 15, 2007, when they were shot multiple times with a .22 caliber rifle and their bodies were thrown down the stairs leading to the cellar in their home. Autopsy results showed that both victims died as the result of close-range gunshot wounds to the head.
Sheri Largin Lake, Largin’s sister and Jimmy and Peggy’s daughter, testified that she went to her parents’ house sometime after 9:00 p.m. on March 15, 2007, and her parents and her brother were there. Largin had a history of drug and alcohol abuse, and he had recently been told to leave a residential treatment center for failing to follow the rules. Jimmy had picked Largin up from the treatment center and had brought him to the Largin residence. Largin had been living with his parents for approximately one week. Sheri testified that her mother had not wanted Largin to stay in the house because he previously had stolen money and property from them.
Sheri was unable to make telephone contact with her parents on March 16, 2007, which was unusual. She drove to their house that evening and found the house dark and the front door locked, which was also unusual. Sheri entered the house, called out to her parents, and walked to her mother’s room, where she saw blood on the floor. She left the house and called emergency 911. The Largins had been in their bedrooms when they were shot with a .22 caliber rifle, and their bodies had been dragged through the house and thrown down the basement stairs. A mop with blood on the handle was found in the kitchen sink. Forensic analysis revealed that DNA on the mop handle was consistent with a mixture of Peggy’s DNA and Largin’s DNA. Officers observed swirl marks on the kitchen floor that indicated that someone had attempted to clean something up with a mop. Largin’s fingerprints were found on several containers of cleaning products recovered near the kitchen sink.
Sheri testified that her brother was not at the house when she arrived that night and that her deceased sister’s Trans Am automobile, which was kept on the Lar-gins’ property, was missing. Several items had been stolen from the house, including credit cards belonging to Jimmy and Peggy, a rifle, and Peggy’s floral makeup bag in which she kept her set of keys and a substantial amount of cash.
Testimony further established that Lar-gin drove the Trans Am to a friend’s house between midnight and 1:00 a.m. on the night of the murders. Largin purchased crack cocaine several times during the next 24 hours and smoked it with some of his acquaintances. Those acquaintances testified that Largin drove the Trans Am on several outings during that time, that he was in possession of the floral pouch that was identified as belonging to Peggy, and that he seemed to have a large amount of money. When Largin ran out of cash to purchase drugs, he began using his parents’ credit cards. Several purchases were verified by receipts and surveillance videos. Largin purchased some items from a Walmart discount store and traded them for more drugs.
Law-enforcement officers were notified of the issuance of a “BOLO”—be on the lookout—for the Trans Am. Officers located the car parked at an apartment complex. Soon after the car was located, Lar-gin and a companion came out of one of *389 the apartments and walked toward the car. They had intended to travel to another location to purchase more crack cocaine. Officers took Largin into custody.
Investigator Simon Miller had been a friend of Jimmy’s for several years, and both he and Jimmy were members of the Church of Jesus Christ of Latter Day Saints. He also knew Peggy and had been introduced to Largin and Sheri. Miller had chatted with Largin on more than one occasion before the murders. Miller spoke with Largin at the police department after he was arrested, and Largin told Miller, “It wasn’t murder ... not in a cold-blooded sense.” (C. 836.) Largin further stated that he started to clean up the crime scene but then decided not to, and that he did not “try to hide it.” (C. 838.)
Several inmates with whom Largin had been incarcerated testified that they heard Largin admit that he had killed his parents. Largin also said that his parents were where they were supposed to be and that, if it were necessary, he would do it again.
Standard of Review
Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial- right of the appellant.”
The standard of review for a claim of plain error is as follows:
“ ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously affectfe] the fairness, integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1063 (Ala.1998).’ ”
Ex parte Brown, 11 So.3d 933, 935-36 (Ala.2008) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999)). See also Towles v. State, 168 So.3d 133 (Ala.2014)(quoting Ex parte Brown).
“In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“ ‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Fray, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [(1936).]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Fray, 456 U.S. at 163, n. 14.’ ”
Ex parte Brown, 11 So.3d at 938.
[[Image here]]
Largin first argues that the trial court erred when it refused to accept his negotiated best-interest guilty plea. Specifically, he argues that the trial court refused to take the plea based on its mistaken belief that the law required Largin’s personal admission of guilt and an in-court allocution. Largin did not raise this issue in the *390 trial court, so we review his claim only for plain error. See Rule 45A,- Ala. R.App. P.
Largin’s assertion that the trial court did not accept the plea due to its misapprehension of the law is not supported by the record.
Prior to trial, the trial court held a hearing at which Largin was expected to plead guilty to one count of capital murder and, in exchange for that plea, the State would dismiss the second count and would not seek the death penalty. However, at the outset of the hearing Largin stated repeatedly that he would not acknowledge his guilt or concede any issues and that he would enter only a “best-interest” plea. See North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The prosecutor stated he had understood that Largin was going to plead guilty and not that, he would enter a best-interest plea. The prosecutor further stated that he would not go forward with a plea if Largin entered a best-interest plea.' The trial court stated that, if there was no guilty plea" based on the parties’ plea agreement, it could not accept ahy plea. After the parties conferred off the record, the Court then said that it would' proceed in order to determine whether there existed a factual basis for the plea and that it would not accept "the plea if there was no factual basis."
The court explained to Largin the procedure it would follow:
“Mr. Largin, I’m going to ask the State to read to you the indictment, explain the elements of the offense, state the range of punishment, articulate or state for the record a factual basis for any plea, and then state for the record what the State’s recommendation in the event of a guilty plea is. And I want the State to set it out in detail. 'And then Tm going to find Out whether or not there is .in fact an agreement that the Court can accept or not after the Court has made a judgment as to whether or not the Court has complied with Rule 14.4[, Ala. R.Crim. P.]”
(R. 322-23.)(Emphasis added.)
During the guilty-plea hearing the State presented an extensive factual basis for the plea and then stated the terms of its plea offer:
“Now, Your Honor, should the defendant honor his part of the guilty plea, as the State is prepared to honor its part, the parties have agreed as follows: that upon his plea of guilty, his admission of guilt to the offense of capital murder in count one of the indictment, that the State would dismiss count two of the indictment and that the State would not seek the death penalty; the State would stipulate to the jury that we do not wish the death [sic] and that at that point we .would ask for life without the possibility of parole; that, there would be no-fíne as the law does not provide for one but only court costs and the mandatory crime victims compensation commission assessment. Given the agreement that ... he would serve life without the possibility of parole and his inability -to pay any restitution, the State would not be seeking any restitution in this matter.
“But all of that is contingent about the defendant’s actual entry of a guilty plea in this case which would be made known to the jury in the matter of the case, understanding that he would reserve the issue of the denial of the motion to suppress for purposes of appeal and would challenge the testimony of [inmate]" George Walter McShan before the jury in the minitrial to be held in this case.”[1]
(R. 332-33.)(Emphasis added.)[2]
*391 The ■ trial court conducted a thorough plea colloquy and then asked Largin how he wanted to plead. Largin stated,
“I will not concede to any of the points that the district attorney is trying to hold against me. I told you how I would plead and that would be in best interest, and that is the only way. I do not concede any of the points that they have made.”
(R. 343.)
The State suggested to the Court that, because Largin ■ did not concede to 'any points in the State’s factual basis, the Court ask him to set forth his version of facts that would support count one of the indictment, that is, to state how he killed his parents pursuant to one course or scheme of conduct in Tuscaloosa County. The prosecutor further stated that if Lar-gin allocated to sufficient facts to establish the elements of the offense, then the State would accept his guilty plea. However, the prosecutor said: “If he continues, to maintain that he did not kill his parents pursuant to one course or scheme of conduct, then what we are doing here is a fraud upon the Court.” (R. 344.) Largin stated: “I am not guilty of capital murder. That’s it.” (R. 345.) The court explained to Largin that he had the opportunity to set forth his version of the facts so that it could determine whether there was a factual basis for the plea. Thus, contrary to Largin’s assertions in his brief, the trial court did not require Largin to allocute personally to the facts required for conviction; the trial court offered him. the opportunity to do so because the State did not agree to a best-interest plea and Largin did not agree with the factual basis presented by the State. Largin was offered the opportunity to set forth his own factual basis admitting the elements of the crime so' that the State could then enter into a plea agreement. However, after Largin conferred with counsel, counsel informed the court that Largin was going to stand silent and let the court determine whether there was a factual basis for the plea.
The court stated:
“Based upon what has been presented, this Court will not accept the guilty plea. Accordingly, the Court is rejecting the plea agreement as has been outlined ’here today and I’m informing the parties that I’m advising the defendant and the prosecutor in open court that of course this Court is not bound by the plea agreement. I’m going to further advise the defendant that if the defendant pleads guilty, I’ll give you still an opportunity to do so.”
(R. 345-46.)(Emphasis added.) The court told Largin that it had rejected the plea because of its concerns about the factual basis of the plea. - (R. 346.) Largin then stated that he would stand on his not-guilty plea.
Initially, we note, as the United States Supreme Court stated in Weatherford v. Bursey, 429 U.S. 545, 561, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977):
*392 “ ‘there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial. It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty.’ See also Ex parte Pfalzgraf, 741 So.2d 1118 (Ala.Crim.App.1999), and Murray v. State, 494 So.2d 891 (Ala.Crim.App.1986).”
Smith v. State, 908 So.2d 273, 282-83 (Ala.Crim.App.2000).
It is clear from the record that there was no plea agreement between Lar-gin and the State. The State set out the terms of the plea agreement it had offered, and one of the terms was that Largin actually plead guilty to capital murder. The State made it abundantly clear that it would not agree to a best-interest plea. Largin then repeatedly stated that he was unwilling to concede his guilt or to plead guilty to the crime with which he had been charged. Thus, there was no “meeting of the minds” and, therefore, no plea agreement.
“Plea agreements are governed by ordinary contract principles. See United States v. Ingram, 979 F.2d 1179, 1184 (7th Cir.1992). At least in theory, ambiguity in an essential term or a mutual mistake about the meaning of such a term can invalidate it. See id.; United States v. Atkinson, 979 F.2d 1219, 1222-23 (7th Cir.1992). When the government proposes a plea agreement, when the defendant accepts it and when the district court enforces it, there must be a meeting of minds on all of its essential terms.”
United States v. Barnes, 83 F.3d 934, 938 (7th Cir.1996). See also Miller v. State, 1 So.3d 1073 (Ala.Crim.App.2007)(noting that discussion of a plea agreement “does not establish that an enforceable plea agreement was reached”). The Alabama Supreme Court in Ex parte Richardson, 678 So.2d 1046, 1047 (Ala.1995), explained “that, if the district attorney makes an offer and that offer is accepted by the accused, either by entering a guilty plea or by taking action to his detriment in reliance on the offer, the plea agreement becomes binding and enforceable.” (Emphasis added.) Largin was unwilling to plead guilty under the terms offered by the State, and he cannot now argue that the trial court erred in refusing to accept his plea. Therefore, he is not entitled to relief on this claim of error.
II.
Largin argues that the trial court erred when it denied his motion to suppress inculpatory statements he made to Investigator Miller after Largin had requested an attorney. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). He claims that Miller engaged in the functional equivalent of interrogation, and that Largin’s statements to Miller were, therefore, inadmissible. We disagree.
Largin filed a motion to suppress statements he made to Investigator Miller on the night Largin was taken into custody. Largin alleged in the motion that his statements were confessionary in nature, given his membership in the Mormon Church and Miller’s leadership position within the church and that the statements were therefore privileged and inadmissible under Rule 505, Ala. R. Evid.[3] During the hearing on Largin’s motion to suppress, he argued that the statements were privileged. He also questioned Miller in an attempt to establish that Miller had inter *393 rogated Largin in violation of his Miranda rights, and he presented the same argument in a post-hearing brief as an alternative to the argument that the statements were privileged.
Miller testified at the suppression hearing that, at the time of the murders, he was an investigator assigned to the criminal-investigation division of the Tuscaloosa Police Department. He had known Jimmy and Peggy for several years because the three of them were active members of the Mormon Church. Miller lived outside Tuscaloosa County and had to park his patrol vehicle inside Tuscaloosa County and drive his personal vehicle from there to his house and back, and Jimmy permitted Miller to switch vehicles on his property when he needed to do so. Miller occasionally encountered Sheri and Largin when he was there. Although Miller did not know Largin as well as he knew Jimmy, he was on a friendly basis with Largin and had seen Largin several times during the years that he came to the Largins’ property. He and Largin had spoken about a variety of topics such as a problem with Largin’s car, various moves he planned to make, and about Largin’s jobs. Miller never saw Largin attend services at the church. He never requested counseling on spiritual matters from Miller, and they never discussed church or spiritual matters.
On the night óf the murders, Miller was contacted at home by his supervisor and was asked to come to the scene. He did not actively work the crime scene, he said. Rather, Miller was asked to help locate Largin because law enforcement did not know whether Largin was a possible victim or the perpetrator. Miller made a telephone call to a member of the church, but the church member told Miller that he had not seen Largin in weeks. That was the extent of Miller’s involvement at the scene and in the investigation of the homicides. Largin was apprehended when the stolen Trans Am was located.
Miller and the police cjuief traveled to the homicide division where Largin was being held. Although Miller was not a homicide investigator so the case was not assigned to him, Miller asked whether he could assist in any way. The lead investigator told him that Largin had requested legal counsel and could not be questioned. Miller then asked to see Largin so he could tell family members and church members that Largin was all right and in jail. Miller testified that he knew that he could not initiate any conversation with Largin concerning the murders, and that he did not do so when he went into the interrogation room.
During the brief conversation with Miller, Largin made inculpatory statements regarding his involvement in the deaths of his parents. Because the interrogation room was equipped with recording devices, the conversation was recorded and a transcript was prepared. Both the recording and the transcript were admitted into evidence during the suppression hearing. We set out the complete transcript because the context of the statements is relevant to a resolution of the issue.
“TRANSCRIPT OF RECORDED CONVERSATION BETWEEN JAMES SCOTT LARGIN AND SIMON MILLER
MARCH 17, 2008
“Time Speaker Transcription
“4:32:00 (Simon Miller enters the interview room.)
“12 Largin (‘L’) How you doin’?
“13 Miller (‘M’) How are you doing, Man?
*394 “14 I’m OK.
“16 (sighs)
“22 (sighs again) What is all that stuff?
“24 That’s handcuffs for me.
“34 Did you go out there?
“37 Yeah, I’m wiped out.
“49 Was it bad?
“4:33:00 I don’t know, Man. I’ve seen a lot of them.
“11 It wasn’t, . . Uh. ...
“22 Well, it’ll, all come out.
“29 I mean, just got to be careful, you know?
“32 How are you feeling?
“4:33:37 I’m alright. . . Tired . . . That’s about it.
“42 Hmmm. . . Well. . . .
“4:34:10 Is Sherry [sic] OK?
“14 She was out there.
“17 Was she OK?
“20 I’m not sure.'
“35 It’s been a rough go, hasn’t it? '
“47 But. . , I’ll make it through it.
“4:35:12 It wasn’t murder. . . not in a cold-blooded sense.
“39 Man, I don’t know if they know. . . They probably don’t know shit, but I mean . . .
Are you (clears throat), are you active in this investigation? ■ S 07 to
(Yawns) . . , Excuse me! Ah! Man! . . , I’m just sittin’.here, Boss. . . . Just stopped in. S* CO 05 © 00
Well, thanks for coming by and talkin’ to me. I appreciate it. <N
Mmm Mmm Mmm ^
I don’t even remember most of it, to tell you the truth. It was a blur.
“4:37:02 L They had me on Seroquel at night. I take 300 mg of Seroquel and so anything is a blur at night anyway ... and combine .that with a situation like they’re . . . they’ve always done.
“4:37:32 L They raise hell with one another like none other. And, uh, • they raised hell at me too, the same way, so. . . .
“52 L Just a bad intersection of events.
“4:38:04 L' But, I didn’t try to hide it.
■ “14 L ' I cleaned up a little bit . . . and said ‘to hell with it, I ain’t goin’ to mess with this."
“38 L Whatever happens to me, happens ... I can deal with it. (Long pause in conversation.)
Where am I goin’? Do you know? iO y-i © Ttf
(unintelligible word or phrase) there’s really only one place to go, idn’t [sic] it? b-03 s >
(Miller gets up to leave, but door is locked) CO ©
Can’t get out. ⅜⅛. Or
(other voices heard from outside the room.) £
Ahhh. . . h-L © 4^ 4^
It’s the Met . . . It’s just that Metro place. That’s the only place you can go, idn’t [sic] it? For now? Until Monday or whatever. . . . Think this used to be the Jail. CO ©
(Long pause in conversation.)
(Miller stands up to leave.) 00 ■⅜
Well, thanks for stopping by. IO iH -⅛*
(Miller leaves the room.) 1C s
“End of Conversation and Transcript.” (C. 836-38.)
*395 The trial court denied the motion to suppress after determining that Miller was not a clergyman for purposes of Rule 505, that Miller had visited with Largin in the capacity of a friend and did not intend to elicit information from him about the crime, and that he did not engage in the functional equivalent of interrogation.
On appeal Largin argues that Miller engaged in tactics that were “reasonably likely to elicit an incriminating response from” him, see Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), that he engaged in the functional equivalent of interrogation, and that the resulting statements were inadmissible because Largin’s Fifth Amendment rights were violated.
When Largin was advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he requested legal counsel. “[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to , further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.” Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). “ “Volunteered statements are not barred by Miranda. See Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). “An unsolicited remark, not in response to any interrogation, does- not fall within the Miranda rule.” Crawford v. State, 479 So.2d 1349, 1352 (Ala.Crim.App.1985).’ ” Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993). Largin argues that, although Miller did not expressly question him about the murders, his actions were the functional equivalent of interrogation. See Innis, 446 U.S. at 300-01.
“It is clear therefore that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. ‘Interrogation,’ as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.”
Innis, 446 U.S. at 300 (footnote omitted).
The United States Supreme Court addressed this issue more fully in Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), when considering whether the police had interrogated Mauro within the meaning of Miranda and Innis when they permitted him to speak with his wife in-the presence of an. officer. The Court stated that “[i]n deciding whether particular police .conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.” Arizona v. Mauro, 481 U.S. at 529-30. The Court further stated:
“One of the questions frequently presented in cases in this area-is whether particular police conduct constitutes ‘interrogation.’ In Miranda, the Court suggested in one passage that ‘interrogation’ referred only to actual ‘questioning initiated by law enforcement officers.’ 384 U.S. at 444. But this statement was clarified in Rhode Island v. Innis, [446 U.S. 291 (1980) ]. In that case, the Court reviewed the police practices that had evoked the Miranda Court’s concern about the coerciveness of the ‘ “interrogation environment.”’ 446 U.S. at 299 (quoting Miranda, supra, at 457. The questioned practices included ‘the use of *396 lineups in which a coached witness would pick the defendant as the perpetrator ... [,] the so-called “reverse lineup” in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime,’ and a variety of ‘psychological ploys, such as to “posi[t]” “the guilt of the subject,” to “minimize the moral seriousness of the offense,” and “to cast blame on the victim or on society.’” 446 U.S. at 299 (quoting Miranda, supra, at 450) (brackets by Innis Court)). None of these techniques involves express questioning, and yet the Court found that any of them, coupled with the ‘interrogation environment,’ was likely to ‘ “subjugate the individual to the will of his examiner” and thereby undermine the privilege against compulsory self-incrimination.’ 446 U.S. at 299 (quoting Miranda, supra, at 457). Thus, the Innis Court concluded that the goals of the Miranda safeguards could be effectuated if' those safeguards extended not only to express questioning, but also to ‘its functional equivalent.’ 446 U.S. at 301. The Court explained the phrase ‘functional equivalent’ of interrogation as including ‘any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.’ Ibid, (footnotes omitted). Finally, it noted that ‘[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.’ Ibid.”
Arizona v. Mauro, 481 U.S. at 526-27.
The United States Supreme Court reversed the judgment of the Arizona Supreme Court, which had held that the tape recording of the conversation Mauro had with his wife should not have been admitted at trial. The Court stated that Mauro had not been subjected to the functional equivalent of interrogation and noted that, during the couple’s brief conversation, the police officer asked Mauro no questions about the crime and that the decision to allow Mauro’s wife to see him was not “the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation.” 446 U.S. at 527 (footnote omitted). The Court also stated that examination of the police officers’ actions from Mauro’s perspective, as suggested by Innis, indicated that it was unlikely that Mauro felt he was being coerced into incriminating himself when his wife was permitted to speak with him. Finally, the Court held that, even though the officers testified that they knew it was possible that Mauro would incriminate himself if they permitted the couple to speak with one another, there was no interrogation. The Court stated: “Officers do not interrogate a suspect simply by hoping that he will incriminate himself.” 446 U.S. at 529.
In light of the Supreme Court’s holdings in Innis and Mauro, we hold that Miller did not engage in the functional equivalent of interrogation when he spoke with Largin. Miller was a friend of Largin’s parents, and Miller and Lar-gin’s parents were members of the same church. Largin and Miller were on a friendly basis and had spoken on several occasions, discussing a variety of general topics. Miller testified that he wanted to see Largin so he could tell Largin’s sister and members of the church community that he was alright. Largin clearly did not feel that Miller was coercing him into incriminating himself because he twice thanked Miller for coming by to see him. Largin’s perceptions are significant to our *397 resolution of this issue because, as the Innis Court stated:
“This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.”
Innis, 446 U.S. at 301-02 (footnotes omitted).
Miller did not ask Largin any questions about the crime, but Largin asked Miller several questions. Within the first minute of Miller’s entry into the room, Largin asked him whether he had been to the scene and whether it was “bad.” Slightly over two minutes into the conversation, Largin asked twice whether his sister was “OK” and he referred to her by her first name, indicating that he knew that Miller was acquainted with her. Three minutes and twelve seconds after Miller entered the room, Largin stated: “It wasn’t murder ... not in a cold-blooded sense.” Lar-gin made additional incriminating statements within the next three minutes.
Miller acknowledged at the suppression hearing that he was aware that Largin might make an incriminating statement while he was in the room, but “[o]ffi-cers do not interrogate a suspect simply by hoping that he will incriminate himself.” Mauro, 481 U.S. at 529.
Largin’s statements were volunteered and were not the result of interrogation or its functional equivalent. Therefore, the trial court committed no error when it denied Largin’s motion to suppress.
III.
Largin argues that the trial court erred when it permitted two officers to testify about his demeanor at the time of his arrest, specifically, that, when he was taken into custody, he did not appear to be very surprised, he did not protest, and he did not ask the reason for his detention. He further argues that the trial court erred when it permitted Paul McNutt to testify that after he and Largin were taken into custody when they came out of the apartment, he heard the word “homicide” over a police radio, and he assumed Largin heard it, but he did not observe any reaction from Largin. According to Largin, this testimony—and the prosecutor’s comment on the testimony during rebuttal closing argument—was a violation of Ex parte Marek, 556 So.2d 375 (Ala.1989), which abolished the tacit-admission rule in pre-arrest situations.
Largin failed to object to any of the instances of alleged error, so our review is for plain error only. Rule 45A, Ala-. R.App. P.
The Marek Court stated that a tacit admission
“is made when ⅛ statement incriminating [the] accused or charging him with crime is made in his presence and hearing, under circumstances naturally calling for a reply or denial, and he has full liberty to speak’; in such a case ‘his silence or failure to reply or deny is admissible in evidence as an admission of the statement or accusation; where, on being accused of crime, with full liberty to speak, one remains silent, his failure to reply or to deny is relevant as *398 tending to show his guilt.’ 22A C.J.S. Criminal Law, § 734(1) at 1068-69 (1961). (Footnotes omitted.)”
556 So.2d at 379.
As the Court made clear in Marek, a statement incriminating the accused or charging him with crime “under circumstances naturally calling for a reply or denial” is a necessary predicate to a tacit admission. None of the testimony to which Largin now objects involved such a statement. Therefore, there was no tacit admission. Alexander v. State, 601 So.2d 1130, 1132 (Ala.Crim.App.1992). Because there was no tacit admission, the prosecutor’s reference to that testimony in rebuttal closing argument did not violate' the prohibition against tacit-admission testimony-
Furthermore, no error resulted from that testimony because evidence of a defendant’s demeanor before or after the offense is admissible at trial. E.g., Pressley v. State, 770 So.2d 115 (Ala.Crim.App.1999); Lowe v. State, 627 So.2d 1127 (Ala.Crim.App.1993); Sheridan State, 591 So.2d 129 (Ala.Crim.App.1991). Likewise, because the testimony was properly admitted, the prosecutor’s reference to that testimony in closing argument was not error. Alexander, 601 So.2d at 1132.
Largin is not entitled to relief on this claim of error.
IV.
Largin next argues that the trial court erred when it allowed the State to introduce prior bad-act testimony that portrayed him as violent, angry, cruel, and dishonest. Specifically, Largin now objects to the following: testimony from a jailhouse informant regarding Largin’s statement about two additional murders; testimony that Largin had failed to . finish college or hold a job- and that his marriage had failed; and testimony regarding Lar-gin’s extensive history of drug abuse and some of the behaviors he exhibited as a result of his drug abuse, particularly those that occurred while he was in a residential rehabilitation facility. He argues that this evidence was admitted in an attempt to show his bad character and to show that he acted in conformity with those character traits when he murdered his parents, that it was not necessary to the State’s case, and that the trial court failed to give a jury instruction limiting the purposes for which the jury could consider the evidence. Largin raises these arguments for the first time on appeal, so our review is for plain error only. Rule 45A, Ala. R.App. P.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
Rule 404(b), Ala. R. Evid., states, in pertinent part:. s
“(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. ..■ . .
A.
Largin argues that reversible error occurred when the State presented evidence that he had committed two prior murders. George McShan, who was in jail with Largin before trial, testified that Lar-gin had spoken to him about being charged with killing his parents, about the evidence against him, and about his relationship *399 with his parents and his sister. McShan described an incident that occurred after those discussions when Largin came to-his cell after another inmate had beaten Lar-gin for at least the second time. As Lar-gin walked toward McShan’s cell, other inmates shouted Largin’s jail nickname, “Killer,” which was the only name the inmates called Largin. Largin told McShan that he truly was a killer and that he could use a small caliber gun to shoot a person in one room and no one in the next room would hear the gunshot. He also told McShan that he had purchased a .22 caliber rifle from a Walmart. McShan testified that Largin became very angry and upset as he spoke. McShan testified that he told Largin to calm down. McShan further stated:
“He said he getting feed of them jumping on him and they, don’t know who he is and all of this. And.he was saying that he had—he said he was looking for them to arrest him-on some more mur.der charges out of Florida and I think Iowa he said.” . i
(R. 1538.) - The prosecutor immediately clarified with McShan that that was “just something [Largin] said.” (R. 1538.)
We note that Largin did not tell’McShan that he had committed two other murders, only that he thought he might be arrested. That testimony was hot intentionally elicited by the State, and it was a brief, isolated, and incidental remark among McShan’s detailed' answers about Largin’s statements regarding the matters set out above. The comment cannot fairly be considered evidence of another crime, wrong, or act within the meaning of Rule 404(b). See, e.g., Woods v. State, 13 So.3d 1 (Ala.Crim.App.2007). Therefore, no limiting instruction to the jury regarding that testimony was necessary. No error and certainly no plain error occurred, and Largin is not entitled to relief on this claim.
B.
Largin argues that reversible error occurred when the State elicited testimony that he1 had failed to finish college, failed in a marriage, and failed to hold a job. Largin did not object to any of that testimony, so we review his claim only for plain error. Testimony about his college performance, divorce, and employment did not constitute evidence of “other crimes, wrongs, or acts” within the meaning of Rule 404(b), nor was it offered “to prove the character of a person in order to show action in conformity therewith.” Because the evidence was not admitted pursuant to Rule 404(b), no limiting instruction to the jury was necessary. No error, and certainly no plain error, occurred as a result of this testimony.
C.
Largin • argues that testimony about his drug and alcohol use and his conduct at a drug-rehabilitation center that resulted in his discharge for violating the facility’s rules constituted- inadmissible prior-bad-act evidence: He did not object to any of the- evidence at trial, so we review the issue for plain error.
The State presented testimony from Largin’s sister and a manager at the rehabilitation center to.demonstrate that Lar-gin had abused drugs and alcohol and that he had been a client at the facility and also to demonstrate that he had been discharged from the facility just prior to the murders. The facility manager testified that Largin had violated the rules at that facility and that he was discharged as a result of those violations. The manager also testified that Largin went into a rage when she confronted him about those violations.
• Initially, we question whether Largin’s status as a drug abuser could be catego *400 rized as prior-bad-act evidence. In any case, the foregoing testimony about his drug-abuse history and his actions related to that abuse was presented as substantive evidence as part of the res gestae, and it was interwoven with the crimes with which Largin had been charged. The evidence completed the story of the crime by presenting the context of events that occurred near the time of the murders. See, e.g., Revis v. State, 101 So.3d 247, 317 (Ala.Crim.App.2011)(“[T]he reference during the interview to Revis’s drug usage was made to determine Revis’s connection to the victim and as a possible motive for the offense. Thus, it was evidence of part of the res gestae of the offense as Revis was accused of murdering [the victim] during a robbery in which he stole pills from [the victim], and the evidence indicates that acquisition of the pills was the reason for the offense.”). See also Scheuing v. State, 161 So.3d 245 (Ala.Crim.App.2013); Lockhart v. State, 163 So.3d 1088 (Ala.Crim.App.2013); Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013). Testimony about Largin’s drug abuse and about his actions during his recent time in the rehabilitation facility—including the actions that resulted in his involuntary release from the facility—indicated that he was still abusing drugs and that he became angry when he was confronted about his inappropriate actions related to his drug use. That evidence was relevant to show the whole picture, that is, to explain the events as they led up to the murders and to explain a possible motive for the crimes that occurred within days after Largin’s father brought him home from the rehabilitation facility.
Rule 403, Ala. R. Evid., states:
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
The determination of whether to exclude evidence under Rule 403 is left to the trial court’s sound discretion and is not to be overturned unless it clearly was an abuse of that discretion. The probative value of the evidence of Largin’s history of drug abuse and, more particularly, his actions at the treatment facility that resulted in his discharge immediately before the murders far outweighed its prejudicial effect.
Therefore, no error or plain error resulted from the admission of this testimony.
D.
Largin also argues that reversible error occurred because the trial court failed to give the jury a limiting instruction explaining the purposes for which the foregoing evidence could be considered. We held above that evidence of Largin’s statement to the jail inmate and evidence of his marital and employment history did not implicate Rule 404(b) and that no limiting instruction was necessary. As to the evidence related to Largin’s drug use, we hold that, because that evidence was offered ás substantive evidence, no limiting instruction was required. See Hosch v. State, 155 So.3d 1048 (Ala.Crim.App.2013). We stated in Hosch:
“Hosch argues that, even if [evidence of his preparations to escape from custody before the murder] was properly admitted, the trial court erred in failing sua sponte to give the jury a limiting instruction. The Alabama Supreme Court in Johnson v. State, 120 So.3d 1119 (Ala.2006), resolved this issue adversely to Hosch. Johnson was convicted of capital murder for killing a man who had been a grand-jury witness for *401 the State of Alabama in a bigamy prosecution against Johnson. Evidence of Johnson’s bigamy conviction and numerous other prior bad acts, including evidence that she attempted to manipulate several men with whom she was having relationships to kill the victim, was admitted at trial without a limiting instruction. This Court held that all the evidence was admissible, either as part of an unbroken chain of events or to prove state of mind, motive, and intent but found plain error as a result of the trial court’s failure to give a limiting instruction as to the prior bad acts other than the bigamy conviction. The Alabama Supreme Court reversed and stated that all the evidence was offered, not as impeachment evidence, but as substantive evidence of the capital crime with which Johnson was charged. The Court then stated:
“Tt is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense. Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged.
“ ‘Accordingly, we conclude that the trial court did not commit plain error in failing to give the jury a limiting instruction regarding its use of the evidence relating to Johnson’s prior bigamy conviction and her prior bad acts, including her adulterous relationships, sexual manipulations, and prod-dings, because that evidence, as discussed above, was properly admitted as substantive evidence of the offense with which Johnson was charged and was not offered for purposes of impeachment.’
“Johnson v. State, 120 So.3d at 1129-30. See also Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013) (‘Here, the prior bad acts were admitted as substantive evidence of guilt and not for impeachment purposes. Thus, the circuit court committed no plain error in failing to sua sponte give a limiting instruction on the use of the Rule 404(b), evidence.’).”
Hosch, 155 So.3d at 1083-84. (Some internal citations omitted.)
Based on our holding in Hosch and the cases cited therein, no limiting instruction was necessary; therefore, no error and certainly no plain error occurred when the trial court did not sua sponte give a limiting charge to the jury.
Largin is not entitled to any relief on these claims of error.
V.
Largin next argues that the State used peremptory strikes against women in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and that this Court should remand the case for a hearing to determine whether the State can offer gender-neutral reasons for the strikes. The United States Supreme Court in Batson v. Kentucky, 476 U.S. 79 (1986), held that it was a violation of the Equal Protection Clause of the United States Constitution for the State to remove a black prospective juror from a black defendant’s jury solely basbd on the juror’s race. In J.E.B. v. Alabama, 511 U.S. 127 *402 (1994), the Supreme Court extended the Batson holding to gender-based strikes.
Largin did not raise a J.E.B. objection at trial. As a result, the State did not have an opportunity to respond to any allegations of discrimination or to state the reasons it exercised peremptory challenges, if the court had required it to do so. The trial court, which would have been positioned to evaluate the. parties’ arguments during the jury-selection proceedings, did not have an opportunity to hear and rule on the allegations. However, we are required to review only for plain error. See Rule 45A, Ala. R.App. P,
“For an appellate court to find plain error in the Batson [or J-.E.B.] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges.” Saunders v. State, 10 So.3d 53, 78 (Ala.Crim.App.2007). Where the record contains no indication of a prima facie case of gender discrimination, there is no plain error. See Gobble v. State, 104 So.3d 920, 949 (Ala.Crim.App.2010).
In Ex parte Trawick, 698 So.2d 162 (Ala.1997), the Alabama Supreme Court stated:
“A party making a Batson or J.E.B. challenge bears the burden of proving a prima- facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a pri-ma facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state’s attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state’s questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.”
698 So.2d at 167-68, quoted in Gobble, 104 So.3d at 948.
“A defendant makes out a prima facie case of discriminatory jury selection by ‘the totality of the relevant facts’ surrounding a prosecutor’s conduct during the defendant’s trial.” Lewis v. State, 24 So.3d 480, 489 (Ala.Crim.App.2006) (quoting Batson, supra at 94), aff'd, 24 So.3d 540 (Ala.2009).
With the foregoing principles in mind, we turn to Largin’s claims. Largin argues that the record establishes a prima facie case of gender discrimination because, he says, the State used a large number of strikes to remove women from the venire; the pattern of strikes against women supports an inference of discrimination; the State failed to question meaningfully many of the female veniremembers; similarly situated male and female veniremembers *403 were treated differently; the female veniremembers collectively were as hete-rogenous as the community as a whole; and the Tuscaloosa County District Attorney’s Office has a history of racial discrimination in its use of peremptory strikes.
Jury selection in this case took place over two days, and veniremembers completed an extensive questionnaire before voir dire began. The 22-page questionnaire was developed by both parties, and consisted of 105 questions, many of which had multiple subparts. As the State notes in its brief, the questionnaire addressed topics such as:
“[T]he potential jurors’ employment; religious beliefs and church attendance; political beliefs; exposure to the media; educational history; whether the potential jurors had medical training; the manner in which they make decisions; how they interact in group situations; prior jury service; experience(s) with the judicial system; opinions about the judicial system; perceptions of law enforcement; whether the potential jurors were acquainted with any judges, attorneys, court personnel, or employees of the Sheriffs, office or Police Department; feelings about criminal punishments (both capital and non-capital); and views on the death penalty.”
(State’s brief, at p. 58.)(Footnote omitted.) The attorneys for both parties stated during voir dire that they had learned much about the veniremembers from their answers to those questions.
The record shows that, after sóme veniremembers were excused or removed for cause, 69 prospective jurors remained on the venire. The State used 22 of its 29 strikes to remove women and 7 strikes to remove men. The jury consisted of 6 men and 6 women, and 2 women served as alternates.
A.
Largin argues that the large number of peremptory strikes exercised against women was indicative of a gender bias that establishes a prima facie case of discrimination. He states: “A defendant can establish a prima facie J.E.B. claim solely on the-fact that a prosecutor used á large number of peremptory challenges to strike female prospective jurors.” (Largin’s brief, at pp. 45-46.) Largin is incorrect. This Court repeatedly has held that a prima facie case of discrimination under Batson cannot be established by numbers alone. E.g., Luong v. State, 199 So.3d 173 (Ala.Crim.App.2016), and cases cited therein. Furthermore, the fact that 6 of the 12 jurors and that both alternate jurors were women must be taken into account when considering whether the State exercised its peremptory challenges in a discriminatory. manner, because it indicates that the State did not use all of its peremptory challenges to exclude women from the jury. The State’s use of 22 of 29 strikes against female veniremembers does not raise an inference of discrimination.
B.
Largin argues that the State used 11 of its first 12 strikes against women and that this established a clear pattern of strikes against female prospective jurors. We disagree..
In Batson the United States Supreme court acknowledged that a pattern of strikes against black jurors might give rise to an inference of discrimination. 476 U.S. at 97. The State exercised its strikes as follows: 4 females; 1 male; 7 females;. 1 male; 1 female; 1 male; 3 females; 1 male; 2 females; 2 males;- 1 female; 1 male; 4 females, including the 2 alternates. Although more females were struck than were niales, the State’s overall striking *404 pattern does not establish a prima facie case of discrimination. In Lee v. Commissioner, Alabama Dep’t of Corrections, 726 F.3d 1172 (11th Cir.2013), the United States Court of Appeals for the Eleventh Circuit considered whether the State’s use of all of its 21 peremptory strikes and 17 of its 18 strikes for eause against black veniremembers established a Batson violation. The court held that the striking pattern was not a per se violation under Batson, but was a factor to be considered along with the remaining relevant circumstances:
“[I]n the statistical analysis courts must consider the statistics in the context of other factors in a case, such as: the racial composition of the venire from which the jurors were struck, the racial composition of the ultimate jury, the substance of the voir dire answers of jurors struck by the State, and any oth-. er evidence in the record of a particular case. Indeed, ‘the number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck.’ See United States v. Ochoa-Vasquez, 428 F.3d 1015, 1044 (11th Cir.2005) (internal quotation marks omitted); see also Cochran v. Herring, 43 F.3d 1404, 1412 (11th Cir.1995) (stating that ‘statistical evidence is merely one factor which the court examines, and it is not necessarily dispositive’ in evaluating whether a Batson violation has occurred).”
726 F.3d at 1224.
The State’s pattern of strikes is a factor to be considered here, but it does not establish a prima facie case of discrimination.
C.
Largin argues that the State failed to question meaningfully many of the female prospective jurors it later struck. He states that more than half of the female prospective jurors the State struck were asked only a few follow-up questions after giving their names and occupations during group voir dire. Largin also compares the answers of some of the female prospective jurors the State struck with the answers of certain male prospective jurors who were not struck and argues that this supports a finding of a prima facie case of discrimination. Largin fails to acknowledge, discuss, or take into account the vast amount of information the prospective jurors provided in their answers to questions on the 22-page questionnaire the parties created. Information from a juror questionnaire is entitled to the same weight as information obtained during voir dire examination, and it may provide a valid reason for a peremptory strike. Therefore, even if we were to agree that the State did not extensively question certain female prospective jurors it struck, that fact would not support an inference of discrimination because, even before the voir dire questioning began, the State had substantial information from which to base its strikes and did not need additional time during voir dire to repeat the same inquiries.
D.
Largin argues that the State struck female prospective jurors for some of them answers during voir dire questioning, but it did not strike male prospective jurors who provided similar answers. Again, Largin’s argument is based solely on the prospective jurors’ answers during voir dire questioning, and he does not refer to the 22-page questionnaire that provided a great deal of information about *405 each prospective juror. Examination of the prospective jurors’ answers on the questionnaires demonstrates that Largin’s argument is meritless. For example, Lar-gin points to female prospective jurors the State struck, D.P. and L.H., who responded in voir dire only to questions about their employers and marital status, and he argues that the State failed to strike “numerous” unnamed male prospective jurors who had similarly answered only a few questions during voir dire examination. He specifically mentions only W.B. and J.Br. as two of the males who were not struck. (Largin’s brief, at p. 51.) A review of the questionnaires completed by those prospective jurors reveals that D.P. did not respond to some of the questions, and she expressed some hesitancy about the death penalty, even indicating that she believed a person committing murder during the course of a robbery should receive a jail sentence, and both of those are gender-neutral reasons for striking a prospective juror. Wimbley v. State, 191 So.3d 176, 227 (Ala.Crim.App.2014)(noting that “a potential juror’s view on the death penalty may constitute a race-neutral reason for a peremptory strike” and that the “lack of response to questions can be a race-neutral reason for striking a prospective juror”). L.H. did not respond to several questions on the questionnaire, and she indicated that she had served on a jury that had acquitted a defendant, and both are gender-neutral reasons for exercising a peremptory strike. Lewis v. State, 24 So.3d 480, 501 (Ala.Crim.App.2006)(holding that “prior jury service that resulted in an acquittal is a race-neutral reason” for a peremptory strike). A review of the questionnaires completed by W.B. and J.Br. demonstrated that they were not similarly situated to D.P. and L.H. Therefore, Lar-gin’s allegation of disparate treatment as to these prospective jurors is not supported by the record.
Largin also argues that D.P. and L.H. were both married and in their 50s, but male prospective. jurors J.Ba. and R.G., who were also married and in their 50s, were not struck. Again, a review of the questionnaires reveals that D.P. and L.H. were not similarly situated to those male prospective jurors. For example, the answers J.Ba. and R.G. gave indicated greater support for the death penalty and a greater willingness to impose it than did the answers given by D.P. and L.H. Unlike L.H., neither J.Ba. nor R.G. had served on a jury that had returned a not-guilty verdict. Furthermore, when space was offered on the questionnaire for the prospective jurors to elaborate on their answers, R.G. provided a more substantial and thorough explanation than did either D.H. or L.H., which indicated that he put forth a greater amount of effort and took more' time to answer the questions fully. Just as inattentiveness and a lack of respect for the process have been deemed race-neutral reasons for a strike, e.g., Rogers v. State, 819 So.2d 643, 649-50 (Ala.Crim.App.2001), R.G.’s attentiveness and respect for the process set him apart as prospective juror the State desired to have on the jury.
Next, Largin argues that the State struck female prospective jurors L.P. and J.S. after they said that they had acquaintances in law enforcement and L.P. said she would tend to favor police witnesses but that it did not- strike male prospective jurors J.Ba., H.H., A.R., D.H., and M.W., who also knew law-enforcement officers and/or who said they would tend to favor police witnesses.[4] Once again Largin’s disparate-treatment argument is based *406 solely on the prospective jurors’ responses on a limited topic during voir dire questioning and is made with total disregard of the substantial number of additional responses given on the lengthy juror questionnaire. A review of the responses on the questionnaire establishes that Largin’s argument is meritless.
J.S. expressed inconsistent opinions concerning capital punishment, and she failed to answer two significant questions about her opinions of capital punishment as compared to a sentence of life imprisonment without the possibility of parole; both provide valid gender-neutral reasons for a peremptory strike. E.g., Whatley v. State, 146 So.3d 437 (Ala.Crim.App.2010)(opinion on return to remandXmixed views on capital punishment); Martin v. State, 62 So.3d 1050 (Ala.Crim.App.2010)(failure to answer questions on a juror questionnaire). Furthermore, J.S. was 21 years old, and she stated on her questionnaire, in relevant part, that she did not think she would be a good juror because she was younger and had had limited life experiences. Age has been held to be a gender-neutral reason for a peremptory challenge. E.g., Sanders v. State, 623 So.2d 428, 432 (Ala.Crim.App.1993). A veniremember’s desire to not serve on a jury has been held to be a gender-neutral reason for exercising a peremptory challenge. E.g., Lee v. State, 898 So.2d 790, 814 (Ala.Crim.App.2001); Clark v. State, 896 So.2d 584, 611 (Ala.Crim.App.2000). L.P. stated on her questionnaire that her father-in-law had been the victim of a robbery one month earlier, and that the case was still pending. The fact that a prospective juror has a family member who was the victim of a crime is a race-neutral reason for exercising a peremptory strike. E.g., Ex parte Drinkard, 777 So.2d 295, 306 (Ala.2000). L.P, stated on the questionnaire that she did not believe she would be a good juror for the case because she managed a small restaurant and was needed there. The record does not support Largin’s claim that the State engaged in disparate, treatment of these male and female veniremembers, because they were not similarly situated.
E.
Largin next argues that the female veniremembers the State'struck were as heterogeneous as the women in the community, as a whole. This Court recognized in McCray v. State, 88 So.3d 1, 20 (Ala.Crim.App.2010), that
“there is almost always going to be some variance among prospective jurors who are struck; therefore, this alone does not establish heterogeneity of the struck veniremembers so as to support an inference of discrimination. The question, as noted in both Ex parte Branch[, 526 So.2d 609 (Ala,1997), ] and Ex parte Trawick[, 698 So.2d 162 (Ala.1997)], is whether.the struck jurors shared only the characteristic at issue, in this case, gender.”
Review of the juror questionnaires and the transcript of voir dire examination reflects that many of the women struck shared similar characteristics other than gender.
F.
.Largin next argues that the Tuscaloosa County District Attorney’s Office has a documented history of discriminatory use of peremptory challenges. The cases he cites in . support of his argument do .not involve gender discrimination.[5] *407 Our determination of whether a prima fa-cie case of gender discrimination exists requires us to consider “the past conduct of the state’s attorney in using peremptory challenges to strike-members of one gender.” Ex parte Trawick, 698 So.2d at 168. (Emphasis added.) Largin cites nothing that demonstrates a history of gender discrimination in the selection of juries in Tuscaloosa County, and.the record does -not reflect any such history.
Based on our thorough review of the Voir dire examination and the juror questionnaires, we find no inference that the prosecutor engaged in purposeful discrimination toward female prospective jurors. Therefore; we find no plain error. .
VI.
Largin next argues that .the trial court erred when it denied his motion for a mistrial. After the jury found Largin guilty but before the sentencing hearing was conducted, defense counsel informed the court that Dr. Karen Salekin, one of Largin’s mitigation witnesses, told defense counsel that, before the State had. completed its presentation of the case, she had seen three jurors who were together during a lunch break, and one of the jurors said she felt sorry for defense counsel because they had nothing to work with to defend Largin, . Largin argues that,.the jurors had violated the court’s order to not discuss the case or form an opinion until all the evidence had been presented, and that the trial court should have granted a mistrial..
“A mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice.” Hammonds v. State, 777 So.2d 750, 767 (Ala.Crim.App. 1999). “A trial judge is allowed broad discretion in determining whether a mistrial should be declared, because he is in the best.position to observe the scenario, to determine its effect upon the jury, and to determine whether the mistrial should be granted.” Berryhill v. State, 726 So.2d 297, 302 (Ala.Crim.App.1998), quoting Dixon v. State, 476 So.2d 1236, 1240 (Ala.Crim.App.1985). Whether there has been juror - misconduct and- whether it has caused prejudice are questions for the trial court, and the trial court’s decisions are reviewed for an abuse- of discretion, Burgess v. State, 827 So.2d 134, 157 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000). See also Rogers v. State, 819 So.2d 643, 654 (Ala.Crim.App.2001). “[T]he trial judge has a duty to conduct a ‘reasonable investigation of irregularities claimed to have been committed’ before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Crim.App.1984).” Holland v. State, 588 So.2d 543, 546 (Ala.Crim.App.1991). See also Shaw v. State, 207 So.3d 79 (Ala.Crim.App.2014).
When Largin made his motion for a- mistrial based on Dr. Salekin’s report of what she had seen, the court asked Dr. Salekin to point out the juror she had overheard. The court then ' questioned that juror, C.P., individually. C.P. denied saying anything to the effect that the defense lawyers had little to work with; and she said she had not heard any other juror say that. The trial court asked C.P. whéther she had made her mind up about Largin’s guilt before deliberations began, and C.P. said she had not. She further stated that her judgment was based on all the evidence presented, including evidence presented by the defense. The trial court then, spoke individually with each of-the remaining jurors. -All denied shying or *408 hearing anything about defense counsel not having much to work with, except J.B., who said that she had heard another juror, whom she could not identify, make a statement similar to the one that had been reported to the court. She said that there was no discussion among any jurors about the statement, and she said that there was no indication that any of the jurors who had been present when the statement was made had already made up their minds about Largin’s guilt.
After examining each juror, the trial court denied the motion for a mistrial and explained:
“[F]rom the Court’s watching the jurors and listening to their responses, what it suggests to the Court is that what took place, whether it was exactly as I represented it or exactly as ... Dr. Salekin represented it, that none of the jurors thought it was anything of any significance; that they all appeared to take their duty and obligations and responsibility very seriously. And so what their lack of—the lack of any juror, other than one, recalling the way I put it suggests to the Court ... that it wasn’t something that had any impact on any juror and certainly even the juror who may have been engaged in a conversation and said words as a part of that conversation. So my point is that it suggests to the Court that the—nothing occurred during this time that would have risen to the level of juror misconduct. And in addition to that, this Court is of the opinion that even if it was— even if it was said or what’s alleged to have been said by [Dr. Salekin] and what the Juror J.B. made some reference to, that in the Court’s view, given what these jurors have said, that does not amount to any juror misconduct. So certainly the Court has not heard anything that would suggest that the jurors haven’t done their best to follow the Court’s instructions not to discuss the case or allow anybody to discuss the case in their presence or that they have not followed the Court’s instructions to base their decisions on the evidence and law and all the law when it’s in. So the motion is denied.”
(R. 2197-98.)
We agree with the trial court that any statement made by a juror expressing that defense counsel had little to work with did not rise to the level of juror misconduct. Rather, the statement was vague an4 ambiguous and did not indicate that the juror who made the statement had prejudged the case or had formed an opinion as to Largin’s guilt. Rather, it indicated that the juror was aware that the defense would be presenting its case, and tended to indicate that the juror would be attentive and would consider that evidence. Furthermore, nothing from the trial court’s questioning of the jurors indicated that they had engaged in any discussions about the case, only that one juror had made the statement as alleged. The trial court fulfilled its duty to investigate the circumstances. The trial court stated that it had watched the jurors and listened to their responses and had determined there had been no juror misconduct. Furthermore, the trial court stated that it had not heard anything that would suggest that the jurors had not based their decision on the evidence and the law. In light of the foregoing, we find no abuse of the trial court’s discretion.
VII.
Largin next argues that the trial court erred when it denied his challenges for cause against veniremembers J.V. and A.H. because, he says, their voir dire answers established that they could not give him a fair trial.
*409 Initially, we note that J.V. and A.H. did not sit on Largin’s jury because Largin used peremptory strikes to remove them from the venire.[6] Therefore, Lar-gin’s claim is subject to a harmless-error analysis. See Bethea v. Springhill Mem’l Hosp., 833 So.2d 1, 7 (Ala.2002)(“[E]ven if the Betheas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Be-theas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial.”).
“A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1993). For that reason, we give great deference to a trial judge’s ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001).” Turner v. State, 924 So.2d 737, 754 (Ala.Crim.App.2002).
“To justify a challenge for cause, there must be a proper statutory ground or ‘“some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.” ’ Clark v. State, 621 So.2d 309, 321 (Ala.Crim.App.1992)(quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Crim.App.1983)). This Court has held that ‘once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions’ about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror ‘need not be excused jnerely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.’ Kinder v. State, 515 So.2d 55, 61 (Ala.Crim.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror ‘“must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused” ’; ‘ “[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.”’ Oryang v. State, 642 So.2d 979, 987 (Ala.Crim.App.1993)(quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Crim.App.1989)).”
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998).
“Even though a prospective juror may initially admit to a potential for bias, the trial court’s denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the persdn can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law.”
Ex parte Land, 678 So.2d 224, 240 (Ala.1996)(quoted in Doster v. State, 72 So.3d 50, 68 (Ala.Crim.App.2010)).
*410 •With these principles in mind, we address Largin’s arguments.
A.
Largin claims that the trial court erred when it ¡failed to strike venire-member J.V. for cause because, he says, “J.V. stated that he would tend to believe what Officer Banks said because they were personal friends.” (Largin’s brief, at p. 62.) He .argues that the trial court denied the motion to strike “without any relevant evidence to show that J.V. could be fair.” (Largin’s brief at p. 63.) Officer Toby Banks was the first officer at the scene, and he testified for the State.
J.V. was initially asked about his friendship with Jamie Banks, Toby’s brother, who was also a police officer. J.V. stated that he would not believe either brother just because they were police officers but that he would believe, what Jamie said, “but that wouldn’t cause [his] mind to stick with that.” . (R. 763.) He then stated that he considered Toby a friend, too. The State asked J.V. whether he would believe Toby if he said it was nighttime and J.V. saw sunshine coming in through the window, and J.V. said he would not believe Toby. J.V. also stated that he could consider Toby’s testimony against the other evidence in the case and he would treat Toby as he would any other witness.
The record does not indicate any evidence of bias. J.V. unequivocally stated that he would consider Toby Banks’s testimony as he would any other witness’s testimony. The circuit court was able to observe J.V. as he answered the parties’ questions during voir dire examination and was in a far better position than is this. Court to judge his credibility. We find no abuse of discretion in the trial court’s denial of Largin’s motion to strike J.V. for cause.
B.
Largin argues that the trial court erred when it refused to strike A.H. for cause because, he says, A.H. had been a crime victim, she was married to a police officer and knew.several police officers, and she expressed concerns about jury service because two of her acquaintances and a relative had been crime victims. During general voir dire questioning, A.H. stated that the chief investigator looked familiar to her, and that.she might have met him through her husband, who was a police officer. Largin asked A.H. whether she would be more likely to give the investigator’s testimony more weight than she would to anyone else’s testimony, and she said that she would hot. Largin then asked A.H. whether, because a family member was a police officer, she would be more likely to believe a police officer’s testimony over any other witness’s testimony simply because he was an officer, and A.H. said she would not, Largin then asked A.H., “Living with one, I guess you realize they sometimes make mistakes?” (R. 666.) In response, A.H. indicated that she agreed. When the State asked venire-members whether there was any reason they wanted to speak privately about an issue that might prevent them from being a juror, A.H. indicated that she would like to do so. During individual voir dire, A.H. stated that, while she did not believe it would “do anything as far as being a juror,” she was acquainted with people whose loved ones had been crime victims and she was not sure whether she could “take that on” herself. (R. 737.) A.H. stated that she could put her own personal situation aside and focus on what happened in this case, and could decide the case based only on the evidence and law in this case. In response to Largin’s questions, A.H. explained that one of the crimes had occurred when she was a small *411 child and that she did not recall anything about , it, and that another of the crimes had occurred approximately 10 years earlier. A.H. said that even though some memories of those crimes had come up as a result of her involvement as a venire-member in Largin’s case those memories were not so vivid that she could not put them out of her mind. She also told Lar-gin that she could be as fair to him as she would be to the State.
“[T]he fact that the potential juror’s father and brother had been victims of crimes did not imply that she would be biased in this case. See Hodges v. State, 856 So.2d 875, 908-909 (Ala.Crim.App.2001), aff'd, 856 So.2d 936 (Ala.2003) (in which a prospective juror gave no indication that any of his experiences concerning the rape and robbery of one of his relatives would affect his ability to be impartial; therefore there' was no reason to remove him for cause).”
Yancey v. State, 65 So.3d 452, 468 (Ala.Crim.App.2009).
We have held that the trial court did not err when it denied an appellant’s motion to strike a veniremember for cause when the veniremember said she was a police dispatcher and she knew the trial judge and some of the police officers who would testify at trial. Lane v. State, 169 So.3d 1076, 1127-28 (Ala.Crim.App.2013), judgment vacated on other grounds by Lane v. Alabama, — U.S. —, 136 S.Ct. 91, 193 L.Ed.2d 7 (2015). A.H. clearly stated that she would not be biased in favor of the State as a result of her relationships with police officers and, in fact, responded affirmatively to Largin’s voir dire question about whether police officers make mistakes. She also stated that her verdict would be based solely on the law and the evidence. The trial court was able to view A.H.’s demeanor and-to consider it along with her answers to voir dire questions, and the record provides no reason to set aside its • determination that A.H. would not be biased. Therefore, the trial court did not err when it denied Largin’s motion to strike A.H. for cause.
For the foregoing reasons, Largin is not entitled .to relief on this claim of error.
VIII.
Largin next argues that the trial court erred when it admitted victim-impact evidence during the guilt .phase of trial, Specifically, he argues.that Largin’s sister, Sheri, impermissibly testified that she had a young son and as to the effect the victims’ deaths had on her and her son, including her treatment by a therapist for post-traumatic stress disorder and the identification.of her.therapist, who was in the courtroom. Largin. further argues that the trial court erred when it permitted inmate George McShan to testify that he broke the inmates’ “code of silence” and testified against Largin at least in part because he felt sorry for Sheri. He argues that his conviction should be. reversed because the testimony had no purpose except to encourage jurors to identify with Sheri in her grief and to bias the jurors against him. Largin did not object to any of the foregoing testimony, so we review only for plain error. Plain error is one that seriously affects a defendant’s substantial rights and has an unfair prejudicial impact on the jury’s deliberations, and Largin’s failure to object weighs heavily against his claim of prejudice. E.g., Ex parte Brown, 11 So.3d 933, 937 (Ala.2008).
Much of Sheri’s testimony to which Largin now objects was admitted to show that she had regular and frequent contact with her parents, and that she and her parents had been making plans for Sheri’s son to stay with her parents during the upcoming weekend. That testimony was relevant because it proved the circum *412 stances leading up to the crime, and its admission was not error. E.g., Woodward v. State, 123 So.3d 989, 1021 (Ala.Crim.App.2011).
While the State was questioning Sheri about her observations at the crime scene when she arrived at her parents’ house to check on them, Sheri testified that she saw blood on the floor. The State said it would not show her any photographs of what she saw on the floor and asked whether she had asked that she not be shown any photographs. Sheri confirmed that. The State then asked whether she was seeing a therapist as a result of what she saw that night, and she said she had been diagnosed with post-traumatic stress disorder and depression, that she was seeing a therapist, and that she was testifying against the therapist’s advice. Because the State was not going to show Sheri available photographs of the crime scene to corroborate her testimony about her observations, her testimony about seeing a therapist provided an explanation for that. Therefore, the testimony was relevant and was not victim-impact testimony, and its admission was not in error. Even if that portion of Sheri’s testimony could be considered irrelevant victim-impact testimony, its admission would not constitute plain error. The admission of victim-impact evidence during the guilt phase of a capital-murder trial may be harmless under Rule 45, Ala. R.App. P. E.g., Russell v. State, [Ms. CR-10-1910, May 29, 2015] — So.3d —. — (Ala.Crim.App.2015).
“It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the appellant] did not receive a fair trial simply because the jurors were told what they probably had already suspected—that [the victim] was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838 (1991)).”
Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995).
We have examined the record as a whole and we cannot conclude that Sheri’s brief testimony about her diagnosis and about seeing a therapist “probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.” Ex parte Rieber, 663 So.2d at 1006. The record shows that the admission of this portion of Sheri’s testimony was brief and that it did not deprive Largin of a fair trial or otherwise prejudice any of his substantial rights. Furthermore, the trial court instructed the jury repeatedly that it must base its decision solely on the evidence and the law, and that it must not be permit emotion, sympathy, or prejudice to influence its verdict. “It is well settled that jurors are presumed to follow, not disregard, the trial court’s instructions.” Brooks v. State, 973 So.2d 380, 409 (Ala.Crim.App.2007). Therefore, even if Sheri’s testimony about her diagnosis and treatment was admitted in error, the error would not rise to the level of plain error.
Largin argues that Sheri’s testimony that identified her current and former therapists and revealed that one of the therapists was in the courtroom suggested “that Ms. Largin Lake was so damaged by the crime that she needed on-scene professional support just to get through the testimony.” (Largin’s brief at p. 69.) All of those details were elicited by Largin, and error, if any, was invited by him. Sandifer *413 v. State, 535 So.2d 203, 206 (Ala.Crim.App.1987).
"Largin argues that the trial court erred when it permitted George McShan to testify that his sympathy for Sheri was his primary motivation for testifying. He further argues that the trial court then highlighted this emotional connection by permitting the State to introduce McShan to Sheri while McShan was on the witness stand. We review these arguments for plain error only, because Largin did not raise these objections at trial. McShan testified that he identified with Sheri because, he said, “I put myself in her place when I lost my father. See, my father was killed.... That’s when my life started going downhill.” (R. 1543.) Even if that portion of McShan’s testimony and the introduction of Sheri to McShan were irrelevant, our review of the entire record clearly demonstrates that these events did not have an unfair prejudicial impact on the jury’s deliberations or otherwise prejudice his substantial rights. The testimony and introduction were brief and innocuous. Moreover, the jurors were instructed that their verdict must be based on the evidence and the law, and not emotion, sympathy, or prejudice, and jurors are presumed to follow the trial court’s , instructions.
Largin is not entitled to relief on any of these claims of error.
IX.
Largin next argues that the State engaged in several acts of misconduct during the guilt phase of his trial. Specifically, he argues: that the prosecutor made improper comments during voir dire, injecting his personal belief as to Largin’s guilt, and inflaming the passions of the venire by speaking of how chickens are killed with bare hands in a barnyard; that the prosecutor elicited improper testimony from inmate George McShan about a “code of silence” among inmates and about his reasons for breaking that code; that the prosecutor exhorted the jury to do its “job” by delivering justice for the victims; and that the prosecutor urged the jury to base its verdict on emotion and sympathy for the victims. Largin objected to none of these instances of alleged misconduct. We review them for plain error only, and the failure to object weighs against any claim of prejudice.
“ ‘In reviewing allegedly improper pros-ecutorial comments, conduct, and questioning qf witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala. 1993). ‘“Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnell v. DeChristoforo, 416 U.S. 637 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala.Crim.App.2004).
Rule 18.4(c), Ala. R.Crim. P., states that the court shall permit the parties to conduct a reasonable examination of *414 prospective jurors, and Rule 18.4(d), Ala. R.Crim. P., states that voir dire examination shall be directed to inquiries related to. grounds for challenges for cause and for peremptory strikes. A trial court has substantial discretion in regulating voir dire questioning. E.g., Ingram v. State, 779 So.2d 1225, 1262 (Ala.Crim.App.1999).
A.
Largin argues that the prosecutor “repeatedly1? injected his personal opinion into the case, but he identifies only one instance of this alleged misconduct—-when the prosecutor told the jury venire that he was using the justice system to try to kill Largin. Largin has taken the sentence out of an extended discourse, R. 640-46, during which the prosecutor explained to the venire that the trial would consist of a guilt phase and, if the jury found Largin guilty, a penalty phase would follow. ' The prosecutor stated: “Because the death penalty is such an issue in this case, we are given the right to talk to you a little bit about your beliefs and your feelings.” (R. 641.) He then stated that some people feel so strongly about the death penalty, one way or the other, that they fail to disclose their true beliefs during- voir dire in order to get on the jury and impose a certain verdict in accordance with those beliefs. The prosecutor elaborated on that point by giving a specific example of a fairly recent case in which four venire-members were selected for the jury after they failed to disclose that they were unalterably opposed to the death penalty, and he said that hiding those beliefs had not been fair, just as it would not be fair to the defense if someone who would always vote the death penalty failed to disclose that fact, hoping to be placed on the jury so he or she could vote to impose the death penalty. The prosecutor said that he called those kinds of veniremembers “Trojan horses,” “based upon the old story about how the Greeks built a horse and hid inside the horse and the Trojans then took it into the city of Troy. And that night the Greeks disembarked from the Trojan horse in order to take the city state of Troy.” (R. 642-43.) The prosecutor continued:
“I mention that to you simply for this reason. This case is important. This case is as important as any that will ever be tried in the United States of America. Because the State, myself and Mr. Wilson ¡representing the State, will be prepared to ask you to impose the death penalty on this defendant, sitting right over here. This man that is living and breathing and sitting in this courtroom. And that’s as serious a matter as you can. have in the United States of America, and it’s one that we are going to ask you to. do. F.or that reason it’s, incumbent upon all of you to be as , honest and forthcoming as you can .possibly be with us about exactly how you feel one way or the other about the death penalty.
“Now that it’s starting to come home to you—and I can sense there has been a change in the courtroom. I can sense •that everybody is—all of a sudden the seriousness has been taken up a notch. You realize I’m trying to kill this man. Not trying to kill him with a rifle. I’m not trying to attack him with a machete. I’m trying to use the law. I’m trying to use our system of justice to kill this man. And I say that for emphasis because I want you to understand just what is at stake here and just how serious the State of'Alabama is about this matter. And believe me, from his point of view it’s just as serious because it’s his life that’s at stake. -So please, please, be open and forthcpming with your answers to these questions.
“You were asked a very few questions yesterday ■ about whether or not you *415 could impose the death penalty. It’s called death-qualification. There’s also life-qualification questions: whether or not you would always impose the death penalty; if you would ignore the option of life without parole. Both sides need to know that. Both sides.
“I’m asking you to consider it another way. I’m not asking you to think about it the way you might around the coffee shop..:. ”
(R. 643-44.)(Emphasis added.)
The prosecutor continued with a lengthy statement about friendly debates that take place at coffee shops and drew a distinction between theoretical discussions about the death penalty and the reality of making a decision in a capital-murder trial. The prosecutor continued:
“What I’m wanting to know now is not can you in theory say that, yes, capital punishment may not be thé best resolution of the case, but it’s necessary in a civilized society and sometimes it has to be done. • I’m asking can you recommend it? That’s where we are going with these questions.
“Let me just ask that question right now. Is there anybody here who has, as we have been talking right now, come to the realization that, even though you believe in the death penalty in general, in theory, you know right now in your heart of hearts that if you are one of the twelve that’s to sit in this jury room and hear the evidence, go back in that jury room and cast your one ballot, your one vote, for death or life; is there anyone here sitting here now thinking I just can’t do it, I can’t be the one. Is there anybody who feels that way?”
(R. 646-47.)
Considered in context, the isolated statement to which Largin now objects did not constitute prosecutorial misconduct. That isolated statement was part of an extensive statement regarding the significance of the case and the possible imposition of the death penalty and the importance of veniremembers’ giving honest answers about their feelings about the death penalty. Rather than prejudicing Largin’s substantial rights, the prosecutor was assuring their protection by emphasizing to the veniremembers their responsibility to ensure a fair trial. No error occurred here.
Similarly, the prosecutor related a story from his youth in the country when he believed that he would be able kill a chicken that was going to be used for food, but that when he was actually in those circumstances, he could not kill the chicken. He explained:
“I give that story just to try and drive home the point that in that jury room there will be twelve people that will have to make a decision one way or the other, .should we get to that point in trial with—will have to make .that excision. I’m just asking you right now, search your hearts and tell us if you are going to be like that ten-year-old child that I was and say I just can’t do it. Because if you can’t do it, you need to. let us know now so that you are not suddenly thrust into that situation and realize, like I did at ten years old, I just can’t do it.”
(R. 660.)
The prosecutor’s analogy did not constitute error.' Much like the statement discussed above, this statement was obviously intended to emphasize to the venire-members the significance of responsibility they would face as jurors, and it also was an illustration that led up to the question about whether they could actually vote to recommend the death penalty if they were faced with that decision. See Adcock v. State, 933 N.E.2d 21, 26 (Ind.App.2010)(trial court did not err “in *416 allowing the prosecutor to analogize the concept of ‘reasonable doubt being like a jigsaw puzzle with pieces missing’ during voir dire”).
Largin is not entitled to relief on either claim of error.
B.
Largin next contends that the prosecutor elicited improper testimony from inmate George McShan regarding an alleged inmate “code of silence,” which McShan was violating by testifying. Lar-gin did not object when the prosecutor asked about the code of silence, so we review only for plain error.
McShan testified that he met Largin when he was transferred from prison to the county jail. McShan acknowledged that he had been sentenced to life imprisonment as a habitual felony offender for three theft convictions, that a petition seeking a sentence reduction was pending in the circuit court, and that the judge presiding over Largin’s trial was the same judge who would be ruling on his petition for sentence reduction. McShan also testified that he was aware that the State opposed any sentence reduction and that its position would not change even if McShan testified for the State in Largin’s trial. It was in this context and in anticipation that Largin would attack McShan’s credibility on cross-examination—by implying that McShan hoped the trial court would grant his pending motion because he had testified at trial—that the State asked McShan whether there was a code of silence among prisoners and, if so, why he violated the code by testifying against Lar-gin.[7] A party may diffuse the impact of anticipated impeachment on cross-examination by presenting the impeaching information on direct examination. E.g., Hosch v. State, 155 So.3d 1048, 1093-94 (Ala.Crim.App.2013). Furthermore, this Court stated that “whenever evidence is introduced that a witness has been convicted of a crime involving moral turpitude, the credibility of that witness has been affected. This is true whether the witness admits this information on direct examination or whether it is elicited by the opposing party during cross-examination.” Murphy v. State, 474 So.2d 771, 774 (Ala.Crim.App.1985).
The prosecutor engaged in no misconduct when he asked McShan about the alleged code of silence, and Largin is not entitled to relief on this claim of plain error.
C.
Largin argues that the prosecutor made several improper statements during opening and closing arguments.
“ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 367 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 *417 So.2d 360 (Ala.Crim.App.1990), aff'd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Crim.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Crim.App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992).
“[Statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989).
The trial court instructed the jury that its verdict was to be based solely on the evidence and that the arguments of counsel were not evidence and should not be considered as such in reaching the verdict. Largin raised no objection at trial to the comments, so we review for plain error only. We have reviewed the comments in light of the entire record, and we find no plain error.
First, Largin argues that the prosecutor exhorted the jury to do its “job” and bring justice to the victims. In its opening argument the State argued, “My job is to present the evidence to you. Your job is to do that justice.” (R. 866.) “ ‘ “There is no impropriety in a prosecutor’s appeal to the jury for justice and to properly perform its duty.’” Freeman v. State, 776 So.2d 160, 186 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000)(quoting Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998)).” McCray v. State, 88 So.3d 1, 40 (Ala.Crim.App.2010). The argument was not improper.
Largin argues next that the prosecutor’s closing arguments improperly inflamed the jurors’ passions and encouraged them to reach a verdict based on sympathy and emotion. Specifically, he states that the prosecutor improperly argued about the victims’ special status as Largin’s parents and argded that Largin “repaid” them for raising and supporting him by killing them, and he states that the prosecutor acted improperly when he urged the jury to do justice for the victims’ daughter and the victims themselves.
In referring to the status of the victims, the prosecutor was merely summarizing the facts presented at trial—that the victims were Largin’s parents and that they raised and supported him, even when he was having problems with ’drugs. To the extent Largin is objecting to the prosecutor’s reference to Largin having “repaid” the victims by killing them, that, too, is a reasonable inference from Largin’s statements to George MeShan regarding his viewpoint of the murders. MeShan testified that Largin told him that he had put his whole life on the line for his parents and that when he wanted something from them, he could not get anything, and he said he had no remorse for killing them because they never did anything for him. However, even if we had found the prosecutor’s use of the term “repaid” improper, we would not have determined that it constituted plain error because it did not so infect the trial with unfairness that Largin was denied due process.
Finally, the prosecutor committed no error when he argued that victims deserved justice. McCray v. State, 88 So.3d 1, 40 (Ala.Crim.App.2010).
*418 We find no merit to any of Largin’s allegations of prosecutorial misconduct, and we find no plain error.
X.
Largin argues that the prosecutor made several improper comments during penalty-phase closing arguments and that he is-due a new sentencing hearing. Our review of this issue is governed by the legal principles set out in part IX.C. of this opinion regarding allegations of improper prosecu-torial argument.
A.
Largin first argues that the prosecutor told the jury that he had many years of experience trying capital cases and that this case was one of the worst he had encountered. Largin maintains that the argument improperly indicated to the jury thát the prosecutor, personally, had already' made the decision that the case was so serious that it warranted the death penalty.
In his rebuttal argument the prosecutor argued:
“That’s the only thing, a sentence of death, a recommendation from you following the law as you are required to do, if you find that aggravating outweighs the mitigating, that’s the only thing that' will get through to James Scott Largin. All I ask you to do is to follow the law.
“It’s not easy. I have been doing this for twenty-five years and it never gets easy. My fifty-sixth murder case. Fifty-six too many. If we are not going to • impose the death sentence on a man who can kill his own mother and father ... in a civilized society where the death penalty is an- option and we have jurors that say they can do it; if we are not going to do it on a man who killed his parents and threw them down the stairwell, when are we going to do it?”
(R. 2520-21.)
Largin objected on the ground that the prosecutor was arguing that a recommendation that the death penalty be imposed would “send a message.” Because Largin raises a different ground on- appeal and because the trial court did not have the opportunity to rule on an objection raising the ground now raised, we review the issue only for plain error.
“In capital cases, ‘the prosecutor and defense counsel shall be given an opportunity to argue for and against respectively the imposition of the death penalty in the individual case.’ Beck v. State, 396 So.2d 645, 663 (Ala.1981), rev’d on other grounds, 485 So.2d 1201 (Ala.1984).” Sneed v. State, 1 So.3d 104, 141 (Ala.Crim.App.2007). The prosecutor here was arguing for the imposition of the death penalty, and committed no error in doing so.
In Wimbley v. State, 191 So.3d 176, 236 (Ala.Crim.App.2014), we reviewed the prosecutor’s statement:
“‘[Prosecutor], ladies and gentlemen of the. jury, I have been a prosecutor since 1994. During that seventeen years, this is the first time that I have ever stood before a jury and asked that jury to do what I am about to ask you to do, that is, to recommend a sentence of death to [the circuit judge].’
“(R. 1002.)”
Wimbley argued on appeal that the prosecutor had given his personal opinion that the death penalty was proper in that case, and. we rejected the argument:
“This Court rejected a similar argument in Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009). In that case, the prosecutor told the jury in the penalty phase:
*419 “ ‘ “Ladies and gentlemen, if this case does not call for the death penalty, what does? ...
“ ‘ “After you weigh it out, I ask you to return a recommendation, an .advisory opinion for a verdict of the death penalty in this case because this case calls for the death penalty. If there has ever been one that does, this case right here calls for it.” ’
“Id. at 91.”
Relying on Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009), we held that the prosecutor was not giving his personal opinion regarding the death sentence but was properly arguing in favor of it in that particular case, and we found no error in' the prosecutor’s comment in Wimbley. Relying on Wimbley and Vanpelt, we hold that the prosecutor in this case did not give a personal opinion regarding the death sentence. We find no error, plain or otherwise, in the prosecutor’s comment.
B.
Largin argues that the prosecutor committed reversible error when he referred to Largin as “inhuman,” and when he compared Largin’s conduct to Adolf Hitler’s. He contends that the comments were inflammatory and went beyond a permissible, fair comment on the evidence. Largin objected at trial only to the first comment, and he did so- on the ground that the argument inflamed the passions of the jury.
During closing argument the prosecutor summarized part of a defense exhibit, a chapter in a book written by Largin’s mitigation expert, Dr. Salekin, in which she explained that a capital-murder defendant’s life history must be shown to the jury so that the jury sees the defendant as a human being. The prosecutor stated, “That only becomes necessary because of what he has done; because what he has done is inhuman.” (R. 2486.) A prosecutor has a right to present argument based on the evidence, and he may argue legitimate inferences from the evidence. . The prosecutor referred to Largin’s actions—not 'Largin, himself—as “inhuman,” and that was a reasonable comment on and inference from the evidence. Therefore, the prosecutor committed no error here. Even if the prosecutor had referred to Largin as “inhuman,” we would have found no error. See Albarran v. State, 96 So.3d 131, 186 (Ala.Crim.App.2011), quoting with approval Johnson v. Zant, 249 Ga. 812, 818, 295 S.E.2d 63, 69 (1982) (“This court has held that flight of oratory, figurative speech, and false logic are not error requiring reversal.... These may include closing argument .by the district .attorney characterizing a defendant as a ‘brute, beast, an animal and a mad dog who did not deserve to live.’”). We note, too, that defense counsel even described Largin as “a defective product.” (R. 2499.)
Largin also argues that • the prosecutor inflamed the passions of the jury by comparing his conduct to Adolf Hitler’s. In rebuttal closing argument, the prosecutor stated: “I think everyone would agree that Adolf Hitler would deserve to be executed. This is a man— maybe he didn’t kill millions, but he killed two people. He killed the two people that brought him into this world.”' (R. 2519.) Largin did not object to the comment, so we review for plain error. First, the prosecutor did not compare his conduct to -Hitler’s. Rather, he was arguing the bounds within which the death penalty- might .be warranted, with the millions of deaths attributed to Hitler being a- clear case in which, everyone would agree the death penalty should be imposed.. The prosecutor then argued that, even though Largin murdered two people and not millions, a *420 death sentence was appropriate based on the facts of the case. Second, a prosecutor is permitted to argue that a death sentence is justified in certain eases. E.g., Vanpelt v. State, 74 So.3d 32, 91 (Ala.Crim.App.2009). Third, because defense counsel argued to the jury that his belief was “that every life has sanctity,” R. 2501, the prosecutor was permitted to respond to that statement by arguing that all would agree that Hitler deserved the death penalty. Id. at 82. No error or plain error occurred as a result of this comment.
C.
Largin argues that, in rebuttal closing argument, the prosecutor encouraged the jury to draw adverse inferences from Largin’s exercise of his rights to a jury trial, to present a defense, and to be found guilty only upon proof beyond a reasonable doubt. Specifically, he finds error with the following argument:
“[Mitigation evidence minimizes] the defendant’s responsibility for what he did. The defendant lacks the ability to take responsibility for his own actions. That’s why he denied what he did by his plea of not guilty. That’s why the defense kept [implying] that someone else had to do it. Sheri’s name—despite their protestations that they’re offended, her name kept coming up.”
(R. 2508.) Largin did not object to the foregoing argument, so we review for plain eiTor.
The prosecutor responded to defense counsel’s arguments about the mitigating evidence he presented on Largin’s behalf. Defense counsel stated: “Evidence was put on in the mitigation phase regarding Mr. Largin’s upbringing. There was no intent here to vilify or to make anybody out to be a bad guy. It was offered not as an excuse but as ah explanation to help you to understand who Mr. Largin is.” (R. 2488.) Defense counsel also stated that Largin suffered from a mental illness, and then argued:
“Again, it’s not an excuse. I do not want anybody here to believe that I’m trying to say he should be excused from anything you have found that he did. Not at all. Offering an explanation to help you to understand why he may have gotten to that point.”
(R. 2491.)
In addition to responding to defense counsel’s arguments explaining Largin’s behavior as, in part, being the result of a mental illness, the prosecutor gave his impressions of the mitigation evidence that had been presented and argued it was due little or no weight. Those arguments were permissible. See, e.g., Ferguson v. State, 814 So.2d 925, 949 (Ala.Crim.App.2000), affirmed, 814 So.2d 970 (Ala.2001) (holding that prosecutor committed no error when arguing that the victims did not have a chance because it was proper rebuttal to the defense argument, based on the proposed mitigating evidence, that Ferguson did not have a chance because of his difficult childhood and his low intelligence).
No error or plain error occurred.
D.
Largin argues that the prosecutor urged the jury to consider nonstatutory aggravating circumstances. Specifically, he states that the prosecutor argued to the jury that evidence of his mental issues constituted an aggravating circumstance and that he encouraged the jury to consider Largin’s lack of remorse and his prior crimes and acts of violence as aggravating circumstances. Largin did not object in the trial court, so we review these issues for plain error.
The prosecutor in his closing arguments told the jury that the State was relying on *421 two aggravating circumstances—that Lar-gin murdered more than one person as part of one course of events, § 13A-5-49(10), Ala.Code 1975, and that he killed them during the course of a robbery, § 13A-5^9(2), Ala.Code 1975, and that both aggravating circumstances had been proven beyond a reasonable doubt when the jury found Largin guilty. The trial court instructed the jury that the State was relying on those two aggravating circumstances and that they had been established beyond a reasonable doubt by the verdict.
In his closing arguments, the prosecutor argued that part of Largin’s proffered mitigation—that he had been diagnosed with narcissistic personality disorder—was not mitigating at all. Contrary to Largin’s claim that the prosecutor’s argument urged the jury to consider his mental-health issues as an additional aggravating circumstance, the prosecutor was arguing that the proffered mitigating evidence was due no weight. We stated in Wimbley v. State, 191 So.3d 176, 240 (Ala.Crim.App.2014):
“It is well settled that the ‘State is not required to agree with the defendant that the evidence offered during the penalty phase is sufficiently mitigating to preclude imposition of the death sentence[, and] the State is free to argue that the evidence is not mitigating at all.’ State v. Storey, 40 S.W.3d 898, 910-11 (Mo.2001). Thus, “‘[a] prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant.” ’ Vanpelt [v. State], 74 So.3d [32,] 90 [ (Ala.Crim.App.2009) ](quoting Malicoat v. Mullin, 426 F.3d 1241, 1257 (10th Cir.2005)). That is, ‘the prosecutor, as an advocate, may argue to the jury that it should give the defendant’s mitigating evidence little or no weight.’ Mitchell v. State, 84 So.3d 968, 1001 (Ala.Crim.App.2010)(citing Storey, 40 S.W.3d at 910-11).”
The prosecutor’s argument regarding the weight the proffered mitigation was due did not constitute error or plain error.
The claim that the prosecutor argued that Largin’s lack of remorse and his prior criminal history constituted nonstatu-tory aggravating circumstances was not raised in the trial court and is reviewed for plain error. As noted above, the prosecutor stated repeatedly that the State was relying on two aggravating circumstances and that both had been established by the guilty verdict, and the trial court instructed the jury that those two aggravating circumstances were the only aggravating circumstances to be considered. Furthermore, the prosecutor conceded in his rebuttal closing argument that Largin had only one prior conviction and no significant history of prior criminal activity. See § 13A-5-51(l), Ala.Code 1975. The prosecutor then referred to Largin’s lack of empathy and remorse—both of which Lar-gin’s mitigation expert testified to—and argued that the jury should consider that evidence when determining the weight it would give the mitigating factors. Because a prosecutor is permitted to argue that proffered mitigation is due little or no weight, the prosecutor’s comment here constituted neither error nor plain error.
E.
Largin argues that, during his rebuttal argument, the prosecutor improperly argued that a sentence of life imprisonment without parole would ignore what Largin did, that Largin did not fear a life-imprisonment-without-parole sentence, and that only a death sentence would “get through” to Largin. He argues that the comments were improper because, he says, *422 they misstated the law, minimized the seriousness of a life sentence, argued facts not in evidence, and encouraged the jury to base its verdict on irrelevant factors. Lar-gin did not object to any of the comments, so we review for plain error only.
Defense counsel’s closing argument focused on the existence of mitigating circumstances and the substantial weight he encouraged the jury to give them, and counsel urged the jury to recommend a sentence of life imprisonment without the possibility of parole. For example, defense counsel argued:
“There has been some evidence, some testimony regarding use of substances by the defendant. That in combination with his mental illness can be considered by you as a mitigating factor. These substances combined with his mental illness severely impacted his ability to conform his conduct.”
(R. 2495.)
Defense counsel also argued:
“It’s very important and I know that you will take time to think about the evidence that we’ve put on this week, the facts that we have drawn out and give them proper weight that they deserve, not making an excuse for Mr.' Largin but to recognize that there have been things in his life that have put him in a position to be in this courtroom today. And that he does have value as human being. His life is worth something. If you find that, I hope that you will return a verdict of life without the possibility of parole.”
(R. 2497.)
A prosecutor is permitted to argue that the death penalty is appropriate in the case being tried, Vanpelt v. State, 74 So.3d 32, 91 (Ala.Crim.App.2009), and to respond to arguments presented by defense counsel, Scheuing v. State, 161 So.3d 245, 281-82 (Ala.Crim.App.2013). In this case, the prosecutor did both. For example, the prosecutor argued:
“I think it may be rationalization on the part of some jurors in cases when they’ve done this, but they say: I want him to spend the rest of his life in prison thinking about what he did, feeling sorry for the people that he murdered and regretting it every day.'
“Folks, the boy ain’t right. He is not going to regret it for a moment. He’has no empathy. He has no remorse for what he did. He may be sorry that he got caught, because he loves only himself. But he is not afraid of life without parole. He’s not afraid of sitting in the jail cell feeling remorseful-for the rest of his life. So please don’t go there. Don’t buy that line of argument. The defendant wants what he wants and expects to get it. He wants you to give him life without parole. And he expects to get it. Just like when he wanted money to go on that drug binge. He expected to get it. And when he was denied that,- he killed his parents, brutally murdered them.
“He fears only the death penalty. And the death penalty is the ultimate penalty that we have under man’s law in the State of Alabama. Ultimate penalty. And if we say we’re capable of imposing it, if we say we’re capable of recommending that to the judge, what kind of case should we recommend it for?”
(R. 2518-19.)
The prosecutor’s comments were permissible; no error or plain error occurred.
F.
Largin argues that his sentence should be reversed because, he says, the cumulative effect of the individual instances of prosecutorial misconduct denied-him a fair trial. This Court has carefully re *423 viewed- the prosecutor’s argument for error, and we have found none. Because no single instance of the prosecutor’s argument was improper, the claim that alleged improper argument had a cumulative prejudicial effect on Largin’s trial is meritless. Harris v. State, 2 So.3d 880, 926 (Ala.Crim.App.2007).
XI.
•Largin next argues that the trial court erroneously admitted evidence of irrelevant prior bad acts during the pénalty phase of the trial. Specifically, Largin argues that the prosecutor was permitted to elicit testimony about his prior acts of violence against his ex-wife and a mari he had badly beaten and also evidence about his suicide attempts. He argues that the evidence was irrelevant to any issue at sentencing; Largin raises this issue for the first time in this Court; therefore, we review it for plain error.
Largin introduced evidence of his suicide attempts and suicidal ideation through the testimony of his mitigation expert, Dr. Salekin. Dr. Salekin said that she had reviewed information about Largin’s legal history, and defense counsel questioned her about some of that history. Specifically, Dr. Salekin testified that the records indicated that Largin had been charged with three domestic-violence crimes, that he had been ordered to take classes intended to reduce domestic-violence crimes but that he had failed to attend the classes and was then charged with violating his probation. She further testified that Lar-gin had a history of acting out against others.
Largin elicited testimony from Dr. Sale-kin about additional records she had reviewed, including those from a treatment facility, Serenity Care. On cross-examination, the prosecutor was permitted to ask Dr. Salekin questions based on information in the records from Serenity Care. Salekin testified that the Serenity Care records indicated that Largin had stated that he had beaten a man unconscious and had thrown, him off a balcony.
The Alabama Supreme Court considered this issue when it arose in the guilt phase of a capital-murder trial and stated:
“The scope of cross-examination in Alabama is quite broad. Rule 611(b), Ala. R. Evid. This means that any question may be asked on cross-examination that is relevant either to any substantive issue in the case or to the witness’s credibility. See Rule 611(b), Ala. R. Evid., Advisory .Committee’s Notes. The trial court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence. Rule 611(a), Ala R. Eyid. Dear-dorff challenges both the testimony that he had previously killed several people and that he had previously been incarcerated, and he asserts that such testimony constitutes the improper admission of evidence of prior bad acts under Rule 404(b), Ala. R. Evid. The testimony, however, was not offered to introduce Deardorff s prior bad acts and to show that he acted in conformity with those prior bad acts, but was elicited on redirect examination by the State regarding documents that had already been offered into evidence by the defense on cross-examination.”
Ex parte Deardorff, 6 So.3d 1235, 1241 (Ala.2008). Because Deardorff had introduced the evidence, his. argument that subsequent questioning by the prosecution about that evidence was rejected. The Alabama Supreme Court also stated that the doctrine of invited error precluded Deardorff. from challenging evidence he had presented to the trial court. .
Like Deardorff, Largin is not entitled to relief on his claim that the State *424 elicited evidence about his prior acts, because he first elicited the testimony when he questioned his expert about the reports she had reviewed.
To the extent Largin argues that the prosecutor in his closing statement urged the jury to consider Largin’s prior acts of aggression as an aggravating circumstance and that the trial court’s jury charge failed to limit the jury’s consideration of this evidence, we disagree. As we fully discussed in Part X.D. of this opinion, the State and the trial court clearly informed the jury, repeatedly, that the only aggravating circumstances relied on by the State were the two that had already been established by the jury’s guilty verdict— that the victims were killed pursuant to one scheme or course of conduct and that they were killed during the course of a robbery.
For the foregoing reasons, Largin is not entitled to relief on his claims. No error or plain error occurred.
XII.
Largin next argues that the trial court’s rulings on several issues at the penalty phase of his trial were in error.
A.
Largin argues that the trial court shifted the burden of proof regarding the evidence he submitted as mitigation. Specifically, he argues that once he offered evidence to establish that he murdered his pai'ents while he “was under the influence of extreme mental or emotional disturbance,” § 13A-5-51(2), Ala.Code 1975, and that his capacity “to appreciate the criminality of his conduct or to conform his copduct to the requirements of law was substantially impaired,” § 13A-5-51(6), Ala.Code 1975, the trial court was required to consider those factors as proven because the State did not disprove their existence. Largin did not raise this argument in the trial court, so we review it for plain error. ■
Section 13A-5-45(g), Ala.Code 1975, provides that, “[w]hen the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.” The United States Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), held that a circuit court must consider all evidence offered in mitigation when determining a capital defendant’s sentence. However, a defendant’s proffer of evidence in support of a mitigating circumstance does not require the trial court to find that the mitigating circumstance exists. Rather, the trial court, after considering all proffered mitigating evidence, has the discretion to determine whether a particular mitigating circumstance has been proven. E.g., Carroll v. State, 215 So.3d 1135 (Ala.Crim.App.2015); Albarran v. State, 96 So.3d 131, 213 (Ala.Crim.App.2011).
Although Largin proffered evidence in support of those mitigating circumstances, the State presented evidence to show that, at the time of the murders, Largin was not under the influence of an extreme mental or emotional disturbance and that he possessed the ability to appreciate the criminality of his conduct. The trial court considered the evidence Largin presented in support of the two mitigating circumstances and exercised its discretion when it found that the evidence did not support those circumstances. In doing so, the trial court did not shift the burden of proof to Largin. The trial court committed no error, much less plain error, in its consider *425 ation of Largiris proffered mitigation evidence. Largin is not entitled to relief.
B.
Largin argues that the trial court failed to comply with § 13A-5-47(d), Ala. Code 1975, which requires the trial court to “enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52.” The statute also requires the trial court to “enter written findings of facts summarizing the crime and the defendant’s participation in it.”
The trial court imposed sentence on October 1, 2009, at Largin’s sentencing hearing. At that time, the trial court orally set out its findings regarding the aggravating and mitigating circumstances it found to exist, including several nonstatutory mitigating circumstances Largin had proffered at the hearing. The court stated that, after weighing the aggravating and mitigating circumstances, it determined that the aggravating circumstances outweighed the mitigating circumstances and imposed the death sentence. The court stated that it would enter a written order as required by statute. The supplemental record in this case contains the trial court’s written sentencing order, and that order complies with the requirements of § 13A-5-47(d). The written order contains all the findings as to aggravating and mitigating circumstances the court stated at Largiris sentencing hearing when it imposed sentence.
Largiris complaint is that, although the trial court stated when it pronounced sentence at the hearing that it would enter a written order as required by statute, the court failed to do so until appellate counsel filed a motion to supplement the record. The trial court then filed its written order on October 8, 2010. Largin argues that this Court “should disregard the trial court’s post-hoc attempt to justify Mr. Largin’s death sentence.” (Largiris brief, at p. 92.)
Largin does not argue that the written order does not satisfy the requirements of the statute, and, to the extent Largiris argument is that the written order should have been submitted earlier, he cites no legal authority for the argument, and we have found none. As Largin correctly notes in his brief, written findings of fact are a component necessary to channel the trial court’s discretion in determining a sentence, and they are critical to the mandatory appellate review of the death sentence. The timing of the entry of the written sentencing order in this case did not compromise those elements of the sentencing process or our review of that process. Furthermore, this Court has remanded several capital-murder cases when the trial court’s sentencing orders did not comply with the requirements of § 13A-5-47(d), and we have reviewed the amended sentencing orders on return to remand. E.g., Johnson v. State, [Ms. CR-10-1606, May 20, 2014] — So.3d — (Ala.Crim.App.2014); Yeomans v. State, 898 So.2d 878 (Ala.Crim.App.2004).
Therefore, the date on which the trial court filed its written sentencing order had no impact on whether the order complied with § 13A-5-47(d). No error occurred, and Largin is not entitled to any relief.
C.
Largin next argues that the trial court considered improper material from the presentence investigation report. Specifically, he argues that the probation officer who prepared the report stated that Largin “displayed an unfathomable lack of remorse,” was calloused and indifferent *426 about his “unspeakable” crimes, and should receive a death sentence. (G. 1093.) Largin objected only to the probation officer’s sentencing recommendation, and the trial court struck that statement at Largin’s request.' As to the remaining comments, Largin failed to raise an objection at trial, so we review only for plain error.
Section 13A-5-47(b), Ala.Code 1975, requires the trial court to order and receive a presentence investigation report before it determines the sentence. The trial court struck the probation officer’s recommendation as to sentencing at Largin’s request. As for the probation officer’s statements regarding Largin’s lack of remorse for the “unspeakable” crimes, we find no indication that the trial court considered those isolated statements in sentencing Largin, and Largin has not directed our attention to anything in the record that indicates that the court did so. Furthermore, the court was well aware of the circurristances surrounding the crimes and Largin’s actions after the crimes, and it had observed Largin’s behavior during trial and in the ■ videotaped confession. Therefore, we find no plain error here. See, e.g., Jackson v. State, 169 So.3d 1 (Ala.Crim.App.2010); Johnson v. State, 521 So.2d 1006 (Ala.Crim.App.1986), aff'd, 521 So.2d 1018 (Ala.1988).
D.
Largin argues that the trial court erred when it permitted the State to present evidence at the guilt phase of trial indicating that he lacked remorse. He argues that the trial court erred when it permitted the State to introduce similar evidence at the penalty phase, and to argue to the jury that the lack of remorse supported imposition of the death sentence. Largin did not object in the trial court to any of the testimony, so we review only for plain error.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
Largin cites several pages of the record where, he says, the State elicited testimony that Largin had éxpressed no remorse for killing his parents. During the guilt phase, the' State asked two inmate witnesses about Largin’s facial éxpression or tone of voice when he told them he had killed his parents. One witness testified that Largin had laughed, but he did not testify that Largin lacked remorse. The second inmate testified that Largin was upset. Without further questioning from the State, that witness testified that he had asked Largin whether he had= any remorse about killing his family and that Largin had told him he did not. Only then did the State clarify by asking whether Largin had any remorse. Largin cites as error the testimony of Jill Wortham, an employee at a drug and alcohol rehabilitation facility where Largin had been a client before the murders. (R. 1132.) There is no mention of remorse on that page of the record or anywhere else in the record of' that witness’s testimony, nor would there be. Largin was a client at the facility before he murdered his parents, so there could have been no testimony about any remorse for the murders. In summary, as to those three witnesses, the record does not support Largin’s claim that the State elicited evidence about his alleged lack of remorse.
Largin also cites as error one of the State’s questions during its examination of Investigator' Simon Miller, the victims’ friend and a member of the church they *427 attended. - Miller had looked in on Largin while he was at the police department because he wanted to pass on information about his well-being to the church members.- The State asked Miller whether Largin had expressed any remorse during their conversation and, without objection, Miller said, “Not that I recall.” (R. 1291.) The question was directed at Miller’s observation of Largin’s behavior and whether Largin demonstrated any evidence of remorse, not whether Largin actually had any remorse. Moreover, the conversation Largin had with Miller was videotaped and the videotape was shown to the jury; therefore, the jurors were able to determine for themselves whether Largin expressed any remorse.
Largin also argues that the trial court erred when it allowed the State to elicit testimony at the sentencing hearing before the jury that Largin had no remorse and that he would never have remorse for the murders. Largin did not object at trial to the alleged error, so we review for plain error. Largin presented the testimony of Dr. Karen Salekin, a psychologist, to support his proposed mitigation. Dr. .Salekin testified that Largin suffered from a narcissistic personality disorder, and she testified at length about the characteristics of a person who has this disorder. For example, she said that a person with this disorder: is concerned only with himself; exploits people; is manipulative; is deceitful; lacks empathy or the capacity to understand others’ feelings; is impulsive; and lacks insight into consequences, ‘so he could make an impulsive decision regarding his own life or the life of another person. Dr. Salekin further testified that. personality disorders are pervasive and enduring, and that it is unlikely that the person with such a disorder would make great changes in his thinking or behavior. She testified that Largin did not have the capacity to connect with or understand other people and that he did not have a real ability to feel for other people. She further testified that her review of Largin’s records revealed that Largin had repeatedly been described as exploitative, manipulative, dishonest, deceitful, and conniving. It is in this context that the State asked Dr. Salekin on cross-examination:
“So what we see in him and what we have seen from the evidence is not likely to change. This lack of—for instance, the lack of empathy for others, would that include lack of remorse? Are we likely to ever see remorse out.of this individual for what he did to his parents?”
(R. 2432.) Dr. Salekin replied that it would not be likely.
The State’s question was based on the witness’s own testimony about the .characteristics of person with a narcissistic personality disorder and about Largin’s characteristics, in particular. Therefore, the question was. not improper.
Finally, Largin also argues that evidence of his lack of remorse was irrelevant and should not have been presented to the jury, and he further argues that -the prosecutor should not have referred to the evidence during his penalty-phase closing arguments. As discussed fully above, none of the testimony was improperly admitted. Furthermore, it is well established that a prosecutor in closing argument may comment on and draw inferences from the evidence. E.g., Morris v. State, 60 So.3d 326, 367 (Ala.Crim.App.2010).
For all of the foregoing reasons, we hold that no plain error occurred with regard to this claim. . ■ .
E.
Largin argues that the trial court erred when it instructed the jury at the penalty *428 phase that the two aggravating circumstances proposed by the State—that the murders were committed during the course of a robbery, and that Largin had murdered two people pursuant to one act or course of conduct—had been established by the guilty verdicts. This argument is meritless.
Section 13A-5-45(e), Ala.Code 1975, provides:
“(e) At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.”
See also § 13A-5-50, Ala.Code 1975 (“The fact that a particular capital offense as defined in Section 13A-5—40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.”). Furthermore, this Court and the Alabama Supreme Court have rejected claims that “double counting” is unconstitutional or otherwise legally impermissible. E.g., Hosch v. State, 155 So.3d 1048, 1111-12 (Ala.Crim.App.2013).
F.
Largin argues that the trial court and prosecutor repeatedly misinformed the jurors that their penalty-phase verdict was a recommendation. He acknowledges that Alabama caselaw has decided this issue adversely to him, but maintains that informing the jury that its verdict is merely advisory creates a risk that the jury will minimize the importance of its role at sentencing. Largin raises this claim for the first time on appeal.[8]
Section 13A-5-46, Ala.Code 1975, states that the jury’s role in the penalty phase of a capital case is to render an advisory verdict recommending a sentence to the circuit judge. Furthermore, Alabama courts have repeatedly held that no error occurs when a prosecutor or trial court informs the jury that its verdict in the penalty phase is advisory. E.g., Wimbley v. State, 191 So.3d 176 (Ala.Crim.App.2014); Thompson v. State, 153 So.3d 84, 164 (Ala.Crim.App.2012). Therefore, no plain error occurred, and Largin is not entitled to relief as to this claim of error.
XIII.
Largin next argues that the trial court made several errors at the guilt phase of his trial that, he says, require a reversal.
A.
Largin first argues that the trial court erred when it allowed the State to cross-examine a defense witness, Ernie Tubbs, about his pending criminal charges, based on the State’s allegation that the witness was biased.
*429 Before Largin called Tubbs to testify, Tubbs’s attorney informed the court that he would object to any questions regarding the pending charges. The State informed the court that it was actively prosecuting Tubbs for rape and for failing to comply with requirements of the community-notification act, but that it would not ask Tubbs about the facts of those cases. The trial court agreed that the State could ask Tubbs whether he had pending charges, and Largin stated that he had no objections. Thereafter, in response to Largin’s questions on direct examination, Tubbs testified that he was residing in the county jail and that he had been charged with failing to register as a sex offender, domestic violence, sodomy, and rape. During cross-examination, the State confirmed the charges pending against Tubbs.
“If error occurred it was invited by defense counsel. Invited error applies to death-penalty cases and operates to waive the error unless ‘it rises to the level of plain error.’ Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991).” Gobble v. State, 104 So.3d 920, 945 (Ala.Crim.App.2010). Largin did not raise this claim of error in the trial court and, in fact, he questioned Tubbs about the charges. As a result, we review for plain error only.
The trial court has substantial discretion in determining the scope of cross-examination. E.g., Albarran v. State, 96 So.3d 131, 165 (Ala.Crim.App.2011). Rule 616, Ala. R. Evid., states, “A party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case.” In Williams v. State, 710 So.2d 1276, 1298 (Ala.Crim.App.1996), we stated that “[i]t is always permissible to cross-examine a witness to ascertain his or her interest, bias, prejudice, or partiality concerning matters about which he or she is testifying, and generally anything that tends to show the witness’s bias, unfriendliness, enmity, or inclination to swear against a party, is admissible.” The pending charges against Tubbs for failing to register as a sex offender, domestic violence, sodomy, and rape and his incarceration in the county jail would reasonably give rise to the inference that Tubbs had a bias against the State. Therefore, the trial court committed no error or plain error when it permitted the State to cross-examine Tubbs and confirm the evidence Largin had elicited on direct examination.
B.
Largin argues that the trial court erred when it excused veniremember C.J.G. ■ after she expressed reservations about capital punishment. Specifically, Largin argues that C.J.G. did not unequivocally state that she could not follow the circuit court’s instructions and recommend a sentence of death, regardless of the facts and circumstances presented.
“ ‘ “The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is ‘whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.”’ Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58] (1987). ‘The crucial inquiry is whether the venireman could follow the court’s instructions and obey his oath, notwithstanding his views on capital punishment.’ Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.) ... (1987). A juror’s bias need not be proved with *430 ‘unmistakable clarity’ because ‘juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.’ Id.
‘ “A trial judge’s finding on whether or not a particular juror is biased ‘is based upon determination of demeanor and credibility that are peculiarly within a trial judge’s province.’ Witt, 469 U.S. at 428. That finding must be accorded proper deference on appeal. Id. ‘A trial court’s ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.’ Nobis v. State, 401 So.2d 191, 198 (Ala.Crim.App.1981).”
“ ‘Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988), affirmed, 548 So.2d 496 (Ala.1989). “[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror.” Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989).’ ”
Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.1998), quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995).
C.J.G. gave answers to some of the questions on the juror questionnaire regarding the death penalty that indicated that she was strongly in favor of Capital punishment as an appropriate penalty and that capital punishment was necessary for some crimes. However, during voir dire examination, C.J.G. answered affirmatively when the State asked the following question:
“Is- there anybody here who has, as we have been talking right now, come to the realization that, even though you believe in the death penalty in general, in theory, you know right now in your heart of hearts that if you are- one of the twelve •that’s to sit in this jury room and hear the evidence, go back in that jury room and cast your one ballot, your one vote, for death or life; is there anyone here sitting here now thinking I just can’t do it, I can’t be the one. Is there anybody who feels that way?”
(R. 647.)
C.J.G. then stated that she previously had thought she could vote for the death penalty but that she had come to the realization that she did not know that she could vote for the death penalty. She further acknowledged that the feelings she had now recognized would substantially interfere with her ability to vote for the death penalty even if she “felt it was otherwise warranted.” (R. 648.)
In response to the State’s challenge for cause, the trial court'stated that it was leaning toward granting the challenge, but deferred ruling. The court later granted the challenge for cause and stated: “Based upon what juror [C.J.G.] said today after reconsidering and given that .[C.J.G.] re-' sponded in some detail regarding a number of matters, the Court is granting the challenge.” . (R. 782.) Because the trial court was in the position to hear C.J.G.’s answer and to observe her demeanor as she responded, we hold that the court did not abuse its discretion when it granted the State’s motion to remove C.J.G. for cause.
C.
Largin next argues that the trial court erred when it death-qualified the jury because, he says, the qualification violated his • right to an impartial guilt-phase jury. When the trial court informed the parties that it would death-qualify the veniremembers,. Largin did not object. Therefore, we review only for plain error. There is no legal support for Largin’s argument, and no plain error occurred.
*431 “A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt[, 469 U.S. 412, 420 (1986),] is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. See Lockhart v. McCree, 476 U.S. 162 (1986). Neither the federal or the state constitution prohibits the state from death-qualifying juries in capital cases. Id.; Haney v. State, 603 So.2d 368, 391-92 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992).”
Williams v. State, 710 So.2d 1276, 1318 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).
No error occurred as to this claim.
D.
Largin next argues that the trial court erred when, during the guilt phase of the trial, it permitted the State to introduce evidence of his mental state and lack of remorse over the death of his parents because, he says, the evidence was irrelevant to his guilt or innocence and it prejudiced the jury. Largin refers to testimony from Investigator Simon Miller, George McShan, Jill Wortham, and others. Lar-gin made the identical argument with regard to Miller, McShan, and Wortham earlier in his brief.- We addressed the issue in part XII.D. of this opinion and resolved it adversely to Largin. He presents nothing additional in this portion of the brief, and we hold, as we did in the earlier portion of the opinion, that no plain error occurred as to the testimony of those three witnesses.
Largin presents two other instances where, he says, the trial court erred when it permitted witnesses to testify about his mental state as it related to the death of his parents. He did not object to the testimony at trial, so we review only for plain error.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). Largin first argues that the trial court erred when it permitted Paul McNutt, who was arrested along with Largin, to testify that when he heard one of the- officers mention a ■ homicide, he looked at Largin and saw that Largin had a “solemn look on his face.” (R. 1409.) Testimony about Largin’s serious facial expression did' not indicate that he lacked remorse, and it did not constitute plain error.-
Largin also argues that the trial court erred when it permitted an inmate to testify that, when Largin told him that he had killed his parents, the look on Largin’s face was “one of relish.” (R. 1510.) This testimony was cumulative to the inmate’s previous testimony that Largin was open and free and spoke with candor about the murders. The inmate reported that Lar-gin had said that the world was a better place without his parents, that he had done what he needed to do, and that he would do it all over again if he had to. The inmate’s testimony was based on his observations of Largin and did not constitute plain error.
E.
Largin argues that the trial court erred when it permitted the State to bolster the testimony of his sister, Sheri. Specifically, he argues that the prosecutor was permitted to refresh her recollection of the 911 call she made and asked leading questions so Sheri would testify in conformance with the allegations of the indict *432 ment, thus improperly bolstering her credibility by making her testimony appear to be more consistent and confident than it otherwise would have. He also argues that the prosecutor was permitted to elicit hearsay statements and other testimony that lacked foundation. Largin did not raise these objections in the trial court, so we review only for plain error.[9]
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
The State explained to the trial court its reason for using the transcript of the 911 call during Sheri’s testimony and stated that it “would offer to play the nine-one-one tape again, interrupting it from time to time with other questions for [Sheri], and provide copjes to the jury so they can follow along and not lose their place in the conversation.” (R. 904.) The trial court permitted the transcripts to be used as a demonstrative aid during the testimony, which did not have the effect of bolstering Sheri’s testimony, and the trial court did not abuse its considerable discretion when it did so. E.g., Blanton v. State, 886 So.2d 850, 868-69 (Ala.Crim.App.2003). No plain error occurred.
Largin’s assertion that the trial court erred when it permitted the State to question Sheri in conformance with the indictment is meritless. The State had the burden of proving Largin’s guilt beyond a reasonable doubt. In fulfilling its burden to prove its case, the State asked Sheri about items from her parents’ home that she had been asked to identify in the months after the murders and which had been stolen during the commission of the crimes. That testimony did not bolster Sheri’s credibility, and the trial court committed no plain error when it allowed the testimony.
There is no merit to Largin’s final claim that the trial court erred when it permitted Sheri to testify that, to her knowledge, her parents had never given Largin a key to their house. The testimony was based on her extensive personal knowledge of her parents’ behavior and was properly admitted. The trial court did not abuse its discretion, and no plain error occurred.
F.
Largin’s next claim of error is that the trial court erred when it allowed expert testimony about DNA evidence that was, he says, irrelevant, confusing, and unfairly prejudicial to him. Specifically, he argues that April Leon, a forensic biologist in the Alabama Department of Forensic Sciences, should not have been permitted to testify that the genetic material recovered from the handle of the mop found in the victims’ kitchen was consistent with a mixture of Largin’s and his mother’s DNA. He states that the testimony was improper because, he says, with regard to another piece of evidence, Leon had testified that she could not differentiate between genetic material from Largin and from his father. We review for plain error because Largin did not raise this claim in the trial court.
As we have stated repeatedly: “The question • of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed ex *433 cept upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). The premise underlying Largin’s argument is that Leon should not have been able to testify that Largin’s genetic material was part of the DNA mixture on the mop handle because, with regard to a sample of genetic material from another piece of evidence—the muzzle of a gun, Leon testified that she could not eliminate Largin as a source of the DNA mixture based on the biological relationship between him and his parents. Largin’s premise is faulty. Leon testified that the reason she could not eliminate Largin as a contributor to the mixture of genetic material on the muzzle was that Peggy Largin was the major contributor to the material in the sample, and the amount of DNA from the minor contributor was insufficient to eliminate Largin as the contributor. Therefore, Leon was testifying about two distinct samples of genetic material, and the inconclusive results regarding the muzzle did not preclude testimony about the clear results she found during her examination of the genetic material on the mop handle.
The testimony about the genetic material on the mop handle was relevant, see Rule 401, Ala. R. Evid., because it corroborated Largin’s statement to the police and supported the State’s theory of the case by establishing that Largin had tried to clean up the blood in the kitchen.
Thus, the evidence was relevant and not unfairly prejudicial, Leon did not overstate her conclusions, and there was no plain error in the admission of the testimony.
XIV.
Largin argues that the trial court erred when it allowed 23 autopsy photographs into evidence during the guilt phase. Specifically, he argues that the photographs were gruesome, unnecessary to prove an element of the crimes, and prejudicial. Largin objected at trial to only one of the photographs, Exhibit 157. As for the remaining photographs, we review for plain error.
“ ‘Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.”’ Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986). ‘Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.’ Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’ Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[A]utopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.”’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d *434 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 830 (2002), on remand to, 851 So.2d 453 (Ala.2002). ‘The same rule applies for videotapes as-for photographs: “The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury.” ’ Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982). See also Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000). Generally, ‘[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence’ and ‘is admissible over the defendant’s objections that the tape was inflammatory, prejudicial, and cumulative.’ Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). ‘Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.’ Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).”
Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
Exhibit 157, the only photograph to which Largin objected to at trial, depicted Peggy’s skull and the path of the bullet through her skull. Largin argued that the photograph was unnecessary and unduly prejudicial, and the trial court overruled the objection. The trial court did not abuse its considerable discretion when it overruled Largiii’s objection to the photograph. Even though the photograph was gruesome, it demonstrated the character and location of wounds, and illustrated the medical examiner’s testimony.[10]
We reach the same conclusion as to the remaining photographs. They depicted the character and extent of the victims’ internal and external wounds, and they were used to aid the medical examiner’s testimony. The trial court did not commit any error, much less plain error, when it admitted the photographs into evidence. Largin is not entitled to relief on this claim.
XV.
Largin argues next that his death sentences must be vacated because they violate Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he argues that the jurors never found beyond a reasonable doubt that the two aggravating circumstances existed, and they did not unanimously determine that the aggravating circumstances outweighed the mitigating circumstances. Largin acknowledges that - Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala,2002), forecloses the arguments he raises. He argues, however that Ex parte Waldrop runs afoul of the United States Constitution and Ring. He further argues that the Alabama Supreme Court’s holding in Ex parte Waldrop should be overruled because: 1) it allows for the imposition of a sentence of death without the jury unanimously finding that the aggravating circumstances outweigh the mitigating circumstances; 2) it impermissibly eases the State’s burden of proving that the death penalty is appropriate by ensuring the jury is unaware that its guilt-phase finding alone authorized the trial judge .to impose the death penalty; and 3) it “undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the im *435 position of the death penalty.” (Largin’s brief, at p. 113.), All of Largin’s arguments have been rejected repeatedly. E.g., Shaw v. State, 207 So.3d 79 (Ala.Crim.App.2014). . This Court is bound by the decisions of the Alabama Supreme Court, § 12-3-16, Ala.Code 1975. We have no authority to modify or reverse the Alabama Supreme Court’s decision.
Therefore, Largin is due no relief on these claims.
XVI.
Largin argues that his death sentence constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He states that Alabama’s procedures for administering the death penalty—lethal injection—pose a substantial risk of inflicting unnecessary pain and that they violate the evolving standards of decency. Largin’s argument consists of only one paragraph, consists of general allegations without specific legal support, and has been rejected repeatedly by Alabama’s appellate courts. E.g., Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008); Carroll v. State, 215 So.3d 1135 (Ala.Crim.App.2015). Largin is not entitled to relief on this claim.
XVII.
Largin argues that the trial court erred when it denied his motion to bar the imposition of the death penalty. In a cursory manner, he states several reasons for that argument. Although he cites a few cases for general propositions of law, Largin has failed to provide this Court with any analysis regarding how those cases apply to this case or to support his argument that Alabama’s death-penalty scheme is unconstitutional. He makes several conclusory factual assertions, but he provides no factual support for those assertions. Although we question whether Largin has satisfied the requirements of Rule 28(a)(10), Ala. R.App. P., we address his sparse allegations.
Largin argues that Alabama’s system of capital punishment is unconstitutional under Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed:2d 388 (2000). He argues that the system lacks standards that are necessary to prevent arbitrary arid disparate treatment of similarly situated people. These arguments have been rejected. See Lewis v. State, 24 So.3d 480, 536 (Ala.Crim.App.2006)(“We fail to see how [Bush v. Gore] lends support for Lewis’s claim, given that the Supreme Court took care to state that its decision was ‘limited to the present circumstances,’ noting that ‘the problem of equal protection in election processes generally present many complexities.’ 531 U.S. at 109”).
Largin argues that Alabama’s death-penalty statute is overly broad and fails to narrow the class of death-eligible defendants. This argument, has also been rejected by Alabama Courts. E.g., McMillan v. State, 139 So.3d 184, 266 (Ala.Crim.App.2010).
Finally, Largiri argues, “Alabama’s death penalty statute violates the Equal Protection Clause of the , Fourteenth Amendment because it leads to geographic differences in impact and is also enforced in a manner that is arbitrary, and racially biased.” (Largin’s brief, at p. 115.) Lar-gin has provided no factual support or legal authority for this allegation, nor has he presented any analysis on the issue. Furthermore, Alabama courts have addressed and .rejected this challenge to the. death penalty. E.g., Vanpelt v. State, 74 So.3d 32, 86-86 (Ala.Crim.App.2009).
*436 All the claims Largin raises here have been rejected by Alabama’s courts of appeal, and he is due no relief.
XVIII.
In a single paragraph at the end of his brief, Largin argues that this Court should reverse his convictions and death sentences because, he says, the cumulative effect of the errors alleged in his brief violates numerous constitutional rights. As we held above, no error occurred in Largin’s case. Therefore, there can be no cumulative effect requiring reversal. “Multiple nonerrors obviously do not require reversal.” Ex parte Ferguson, 814 So.2d 970, 980 (Ala.2001)(Johnstone, J., concurring specially). Largin’s claim fails.
XVTV.
As required by § 13A-5-53, Ala.Code 1975, this Court must address the propriety of Largin’s capital-murder conviction and his sentence of death. Largin was indicted for, and convicted of, murdering his parents, Jimmy and Peggy Largin, during the course of a robbery and by one act or pursuant to one scheme or course of conduct, offenses defined as capital by § 13A-5-40(a)(2) and (a)(10), Ala.Code 1975. The jury, by a vote of 11 to 1, recommended that Largin be sentenced to death.
The record reflects that Largin’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975. The trial court found two aggravating circumstances: that the murders occurred while Largin was engaged in a robbery, § 13A-5-49(4), Ala.Code 1975, and that the murders were committed pursuant to one act or pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala. Code 1975. The trial court found one statutory mitigating circumstance, that Largin did not have a significant criminal history, § 13A-5-49(l), Ala.Code 1975. The trial court found several nonstatutory mitigating circumstances: that Largin suffered from a narcissistic personality disorder; that his upbringing was turbulent; that he had alcohol- and substance-abuse problems; that there was evidence of Largin’s good character related to his education, military service, and work history; and that there was evidence that Largin displayed good behavior while incarcerated. The circuit court’s sentencing order shows that it properly weighed the aggravating and mitigating circumstances and correctly sentenced Largin to death.
This Court has independently weighed the aggravating and the mitigating circumstances as required by § 13A-5-53(b)(2), Ala.Code 1975. We are convinced, as was the circuit court, that death was the appropriate sentence for Largin’s capital crimes.
Largin’s death sentence is not disproportionate or excessive when compared to penalties imposed in similar capital-murder cases, considering the crimes and the defendant. See § 13A-5-53(b)(3), Ala. Code 1975. E.g., Luong v. State, 199 So.3d 173 (Ala.Crim.App.2015)(murder of two or more people pursuant to one act or pursuant to one scheme or course of conduct); Spencer v. State, 58 So.3d 215 (Ala.Crim.App.2008)(same); Shanklin v. State, 187 So.3d 734 (Ala.Crim.App.2014)(murder during the course of a robbery); McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App.1999)(“two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder”).
Last, as required by Rule 45A, Ala. R.App. P., we have searched the record for *437 any error that may have adversely affected Largins’ substantial rights and have found none.
Therefore, Largin’s convictions and sentence of death are due to be affirmed.
AFFIRMED.
KELLUM, BURKE, and JOINER, JJ., concur.
WINDOM, P.J., recuses herself.

. Section 13A-5-42, Ala.Code 1975, provides that when a defendant who is indicted for a *391 capital offense pleads guilty to the crime, the State must still prove his guilt beyond a reasonable doubt to a jury.

. The prosecutor stated that, if Largin actually admitted-his guilt and the case proceeded under § 13A-5-42, Ala.Code 1975, it was understood that Largin "would reserve the denial of the motion to suppress for purposes of appeal and would challenge the testimony of [inmate] George Walter McShan before the jury....” (R. 334.) Thus, Largin’s assertion in his reply brief that, pursuant to the plea agreement, "the State agreed to let Mr. Lar-gin continue to contest his guilt” by preserving two, issues for review,.Largin’s reply brief, at pp. 2-3, is not accurate.

. Largin does not raise this argument on appeal.

. Largin struck D.H. an'd M.W. from the veni-re.

. The cases cited involve findings regarding racial discrimination decades earlier; one case discussed a history of discrimination in the early 1980s, before Batson was decided, *407 and the other case discussed cases tried in the early 1990s.

. Largin used his 9th peremptory strike to remove A.H. from the venire, and his 16th peremptory strike to remove J.V. from the jury.

. Largin attacked McShan’s credibility extensively on Ais point. (R, 1545-52.)

. In footnote 26 of his brief, Largin lists 31 pages of the record where, he says, the trial court or the prosecutor informed the jury that its verdict was advisory. We have reviewed the pages of the record cited by Largin, and some of those pages contain no reference to the verdict being advisory or a recommendation; several of the citations were to statements made to the venire during voir dire questioning and not to the jury, itself; and some of the citations were to references made after the jury had reached its sentencing recommendation.

. Largin did not object to the testimony regarding the transcript of the 911 call. He objected to the State’s proffer of the transcript into evidence, and the trial judge sustained that objection.

. The prosecutor did not show Exhibit 157 to the jury during the medical examiner’s testimony, R. 1827, but it was available to the jury during deliberations.